## CORN PRODUCTS REFINING CO. et al. v. FEDERAL TRADE COMMISSION.

### No. 8116.

Circuit Court of Appeals, Seventh Circuit.

July 6, 1944.

Rehearing Denied Aug. 16, 1944.

Wm. S. Jameson, of Chicago, Ill., and Frank H. Hall, Sidney S. Coggan, and Parker McCollester, all of New York City (Lord, Day & Lord, of New York City, of counsel), for petitioner.

Joseph J. Smith, Jr., Walter B. Wooden, Asst. Chief Counsel, and W. T. Kelley, Chief Counsel, Federal Trade Commission, all of Washington, D. C., for respondent.

Before MAJOR, and KERNER, Circuit Judges, and LINDLEY, District Judge.

214

LINDLEY, District Judge.

Respondent issued a complaint on October 21, 1938, amended March 25, 1939, charging that petitioners had violated Sections 2(a), 2(e) and 3 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. §§ 13(a, e), 14. Petitioners answered denying the charges and averring that, if the acts complained of are prohibited, the statute is unconstitutional when so applied. The ensuing order, which petitioners seek to set aside and respondent to have enforced, directs petitioners to cease and desist from (1) discriminating in prices between purchasers of glucose, starch products and corn gluten feed and meal; (2) supplying services to Curtiss Candy Company in the latter's resale of dextrose purchased from petitioners, while failing to accord similar facilities to other and competitive customers upon proportionally equal terms; and (3) selling certain merchandise "on the condition that the purchaser shall not use similar products of a competitor."

*Sales of glucose at delivered prices based on Chicago price and freight from that city but delivered from Kansas City.*

The evidence upon this phase of the controversy is not in dispute. Petitioners manufacture glucose (corn syrup) in Chicago and Kansas City, and ship it from these two points to purchasers residing in various cities in the west and southwest. From which plant deliveries shall be made is entirely within control of petitioners and the selling prices are fixed by them by adding to the effective Chicago price the freight rate from that city to destination, regardless of whether the merchandise is forwarded from Kansas City or from Chicago. Under this formula, glucose delivered from Kansas City to places nearer that city sells at the Chicago price plus the freight from Chicago, which exceeds freight from Kansas City by substantial percentages; the excess for St. Joseph being approximately 31 cents per 100 pounds; Fort Smith, 20 cents; Hutchinson, 25 cents; Lincoln, 16 cents; Waco, 19 cents; Sherman, 20 cents; San Antonio, 19 cents; Denver, 10 cents and Salt Lake City, 10 cents. Purchasers in these cities are manufacturers using glucose in making candy, competitively engaged in sale of their products to customers located in various states.

Glucose is a major raw material entering into many candies, constituting from 5 to 90 per cent of the weight of the finished article, being greater in the cheaper classes. The higher prices paid in cities other than Chicago "result to a greater or lesser degree" in higher material costs than those of manufacturers in Chicago. Those paying the higher prices "may attempt to recover such increased costs" by increasing the price or making sales "on a non-profit or other basis"; the effect in any case is to reduce profit pro tanto. The result just mentioned may work out either through the absorption of higher costs in sale at competitive prices or indirectly through a reduced volume of business and the ultimate effect may be to diminish the ability of those paying the higher prices to compete with those paying the lower. These results may be avoided or augmented by the effect upon the cost to such manufacturers of such other factors as labor, taxes, rents, insurance, other ingredients, proximity to markets and delivery.

The Commission found that a purchaser located nearer freight-wise to Kansas City than Chicago who receives delivery from Kansas City is forced to pay a price which includes an item for delivery not actually incurred; that Chicago purchasers receiving delivery from Kansas City buy at a price which does not include any freight, artificial or real, and that any purchaser located nearer Chicago than Kansas City who receives delivery from the latter point is charged a price which does not include all of the actual freight. Its ultimate finding was that such discrimination results in substantial injury to petitioners' competitors; hinders, obstructs and tends to suppress competition among petitioners' customers and to create a monopoly in processing and refining corn and in sale and resale of its by-products and has resulted in substantial injury to competition among purchasers by affording substantial unjustified price advantages to preferred customers and not to others, in violation of subsection (a), Section 2 of the Act.

Our inquiry is whether the evidence is such as to justify the finding that petitioners have discriminated in prices between competitive purchasers of commodities of like grade and that such discrimination will probably substantially lessen competition or tend to create a monopoly in commerce or to injure, destroy or prevent competition with any person who knowingly receives the benefit of such discrimination or whether the evidence discloses that the discrimin-

ation grew out of only due allowance for differences in the cost of delivery resulting from different methods or quantities of sales and deliveries under Section 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13.

When purchasers receive goods from Kansas City, the sales price of which is fixed by charging the Chicago quotation plus the freight from Chicago rather than that from Kansas City, at a substantial increase of cost to the purchasers, a fictional factor is included in the sales price which is warranted in no way by actual delivery cost or other element. In some instances the price does not include all the actual freight; in others it includes more. In other words the item of freight from Chicago upon goods shipped from other points is an artificial element of cost arbitrarily added by petitioners. That it is substantial is apparent; in some instances amounting to approximately $400 per carload. Consequently, so far as this ingredient is concerned, purchasers in cities discriminated against have higher costs of manufacture than those elsewhere with whom they are competitively engaged in purchase of petitioners' glucose and sale of candy made therefrom. The parties stipulate that the effect "may be" to diminish the ability of those paying the higher prices to compete with those paying lower prices and that such increased cost can be met only by raising the prices of finished products or by making sales on a non-profit basis. In either event, obviously, the profit is reduced, in the absence of any offsetting factor. Consequently, some competitors have moved to Chicago, thereby decreasing their cost not only by reducing the actual cost of delivery but also by elimination of the fictional freight charge to which they were subjected when located in less favorably treated communities.

■ In so far as the delivery price includes for freight more than the actual cost of transportation it measures a definite discrimination forbidden by statute. Upon the principle of equality, the Act forbids any difference in charges to different competitive customers not based upon actual differences in service or delivery. If a difference is to be justified because of presence of the latter element, it must have some reasonable relationship to actual cost and may not be of such character or quality as to work an unjust discrimination. Western Union Telegraph Co. v. Call Pub-

lishing Company, 181 U.S. 92, 100, 21 S.Ct. 561, 45 L.Ed. 765. The inclusion of a fictional cost of delivery, having no justification in fact, in itself suggests, upon the part of the manufacturer, arbitrary fixation of prices discriminating illegally as between competitive customers. ·Systematic price discrimination is irreconcilable with free, active competition. It is not the kind of price competition found in a truly competitive market. Thus in United States v. Sugar Institute, D. C., 15 F.Supp. 817, 908, the court condemned and enjoined defendants from "determining transportation charges or freight applications to be collected from customers, or limiting freight absorptions" and "selling only on delivered prices or on any system of delivered prices, including zone prices or refusing to sell f. o. b. refinery." Upon appeal defendants waived their assignments of error as to each of these. The Supreme Court modified the decree in other particulars, not pertinent here, and affirmed in all other respects. Sugar Institute v. United States, 297 U.S. 553, 591, 605, 56 S.Ct. 629, 80 L. Ed. 859. Thus defendants were finally enjoined from selling at prices including artificial or fictional items of freight and the court adhered to the reasoning of Western Union Telegraph Co. v. Call Publishing Co., 181 U.S. 92, 21 S.Ct. 561, 564, 45 L.Ed. 765, forbidding "any difference in charge which is not based upon difference in service."

■ We think it irrefutable from the facts that resulting substantial loss is reasonably likely to accrue to purchasers in the less favorably located communities. The statute does not require proof of actual injury. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653. Under Section 2(a) it is unlawful to discriminate in price between different purchasers where the effect "may be" substantially to lessen competition or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. It is the congressional intent to halt in its incipiency any possible injury to the public before it may have actually weakened the fabric of fair competition.

■ Petitioners' argument as to the wisdom or desirability of the expressed congressional economic policy is wholly beside the point. It is elementary, but it will work no harm to reiterate, that with determination of the wisdom of legislative

policies, we are in no way concerned. It is far beyond our function to decide or declare what is wise or unwise in statutory economic, political or fiscal tenets. The Congress is charged with the obligation to determine all such questions. When a standard of conduct has once been fixed by legislative enactment, the only functions of the judiciary, as a coordinate branch of government, are so to interpret the statute as to promote and effectuate the disclosed intent of Congress, to determine whether a factual situation is within the contemplation of the act and whether the legislation or the actions of administrative bodies charged with enforcing it infringe upon the constitution. If the standard proves unsatisfactory or unwise, relief can emanate only from Congress.

■ In this connection petitioners insist that debates in the Congress disclose that it was not the intent of that body to place the "basing-point" system of distribution of commodities beyond the pale; that the Congress, sub silentio approved the method and that its acts are within the range of such approved procedure. We are not advised that such so-called system has any recognized legal definition or any well established boundary lines. Just what pattern it follows is uncertain. And to us the debates indicate at most only disagreement between members of the Congress as to the desirability or non-desirability of any such practice, resulting in the end, in utter silence in the Act upon that subject matter,—neither condemnation nor approval, and this in face of the fact that the Federal Trade Commission previously in 1924 had held that the "basing-point" method of distribution employed by the steel companies embraced unlawful price discrimination under the Clayton Act. 8 F. T. C. 1. Such was the administrative ruling in effect at the time when Congress acted. Indeed, in presenting the bill the member in charge announced that he believed the system to be "indefensible." Rather than indulge in futile inquiry as to what individual members of the Congress may have thought as to what is wise economic policy in this respect, we conceive it our duty to give effect to the words of the statute as written and to determine not whether any suggested formal pattern is beneficial and desirable but whether the specific practice of petitioners is within the prohibition. A search for meaning, for significance, in the silence of the Congress is fraught with such speculation as to afford little aid in the interpretation of express words. Scripps-Howard Radio, Inc., v. Federal Communications Commission, 316 U.S. 4, 11, 62 S.Ct. 875, 86 L.Ed. 1229. As we read the Act, it does not grant exemption from discrimination merely because the facts fall within certain formulae. The real question is, do the discriminations inherently have the condemned probable effect upon competition.

Petitioners' reliance upon Staley Mfg. Co. v. Federal Trade Commission, 7 Cir., 135 F.2d 453, is of no avail when we regard the comparative factual situations. In its final determination the court has there condemned the practice here disapproved. The final disposition of that case grew out of the belief of the court that the manufacturer was, under the facts there involved, justified in what it did in the proviso of the statute exempting the vendor from liability if it proves that the practice complained of is necessary, in good faith, to meet the lower prices of competitors. In other words, the facts were such, in the belief of the majority, as to rebut, as provided by the Act, the prima facie case of violation made by the Commission. No such question is presented to us here, for the present record discloses no such contention and no such rebutting facts.

Nor do we think that there was lack of proof that the purchaser knowingly received the benefit of the discrimination, in the face of the fact that certain customers have moved to Chicago from outlying cities; that it is well known to the public that petitioners' prices include a charge for freight from Chicago wholly fictional when goods are shipped from other places, and that a customer getting wares in or near Chicago at a delivered price including actual Chicago freight well knew that he was thereby buying at a proportionately lower price than his competitors in the various cities named were charged when they were supplied from Kansas City at the Chicago price plus a fictional freight from Chicago.

*Discriminations from Booking Practices.*

■ The evidence discloses, without contradiction, that upon promulgation of price advances, petitioners, sometimes, for a period of from five to ten days after an announced increase, accept orders for future delivery at the previously prevailing lower price. In other words, they allow

favored customers options for delivery in the future at the old lower prices rather than the new higher ones. Later deliveries upon these options consummate completion of the contracts and frequently extend over substantial periods after establishment of the new prices. Petitioners also accept orders for sales by tank cars to customers who have no facilities for handling such cars and who, consequently, receive delivery from tank wagons which are supplied from petitioners' storage. The price charged is the lower tank car price.

We think the only reasonable inference is that each of these favored customers receives inevitably an illegal discriminatory advantage. Although, ostensibly, all customers are subject to the same terms, the privilege of booking orders on an advancing market for future deliveries at abandoned lower prices, creates discrimination in fact, whereby certain purchasers may be able to buy at substantially lower prices than their competitors. No customer knows how another is being treated. The agreed fact that the result "may be" that after a price increase, one customer is purchasing goods at the new and higher price and another at the old lower price, in itself, is sufficient to justify the ultimate finding. There is no exemption from liability for such action in the statutory provision that petitioners may select their own customers in bona fide transactions and not in restraint of trade. The Commission was amply justified in finding the practices reasonably likely to diminish the buying ability of those paying high prices as compared with competitors paying the lower prices.

■ Petitioners contend that the prima facie case of discriminatory booking practice is rebutted "by showing that a lower price was made in good faith to meet an equally low price of competitors" as authorized by subsection (b) of Section 2 of the Clayton Act as amended by Robinson-Patman Act, 15 U.S.C.A. § 13(b). We think the evidence is insufficient to sustain this affirmative defence. After the Commission had made out its prima facie case, petitioners offered testimony to justify their action under subsection (b) but it was general in character and vague in effect, being merely that the discriminations occurred because of a competitive situation brought upon petitioners where "some competitor had offered purchasers the same proposition" and that, after a bitter controversy had arisen in which the wagon buyers claimed they had been discriminated against in favor of car buyers, competitors took orders from wagon buyers at tank car prices which, the witness said, "I suppose forced us to do likewise." There was no testimony as to specific instances or facts but merely a conclusion upon the part of the witnesses that the prima facie case of discrimination was justified by competition. This, it seems to us, is not the sort of testimony sufficient to sustain a finding of exemption provided by Congress for meeting competition or to justify a finding that the prima facie case of discrimination as to booking practices has been rebutted. Indeed, if competitors' prices were arrived at in the same manner, to approve the defence, we would be driven to the inconsistent position of approving one evil practice because it was indulged in in order to meet a similar evil practice.

*Special allowances to certain buyers of gluten feed and meal.*

■ It is stipulated that petitioners sold to Cooperative Mills in Buffalo, gluten feed and meal under contracts whereby the vendors agreed to allow the purchaser a deduction from the market price amounting to 50 cents per ton upon purchases in certain quantities and to 65 cents per ton upon those in certain larger quantities; that the purchaser resold these products, both unmixed and as ingredients in other mixtures, to agent buyers and retail stores controlled by it; that, during the same period, petitioners sold the same wares to other dealers and feed mixers in the same territory competing directly with Cooperative, without discount or rebate. Similar are the facts as to purchases by Allied Mills, Inc., Chicago, Jesse C. Stewart & Company, Pittsburgh, E. W. Bailey & Company, Montpelier, Vermont, Marshfield Milling Company, Marshfield, Wisconsin, and Farley Feed Company, Janesville, Wisconsin. The allowances are sufficient, if and when reflected, "to attract business to the Cooperative" and similar purchasers "away from their respective competitors or to force competitors to resell such products at a substantially reduced profit or to refrain from selling" and the allowance is sufficient to increase substantially the favored purchasers' respective margins of profit. There was no evidence that these differences constituted only due allowance for actual differences in cost of manufacture, delivery or otherwise. The Commission held the discriminations illegal.

218

These purchasers have been given discounts of 50 cents or more a ton from the regular market prices. One receives a discount on purchases of not less than 1200 tons per month, and a greater one if his deliveries are not less than 1500 tons per month, with an additional 15 cents per ton on purchases exceeding 2500 tons per month. Four others receive similar discounts, although they purchase much smaller quantities. Each is in competition with others in its territory. Again petitioners assert that the necessary adverse effect upon competition must be an actuality rather than a reasonable probability and that, in the absence of proof that the favored customer uses the discriminatory price to undersell, the possibility that such adverse effect is reasonably probable is conclusively negatived. We think the facts lead to the opposite inference and that the natural result is even more than "reasonably probable" to produce the prohibited injurious effect upon competition.

*Allowances to Keever Starch Company and Stein Hall Company.*

The facts regarding this phase of the case were stipulated and were similar in import to those mentioned under the last heading. Petitioners make no contention that these allowances are justified in the cost of manufacture, sale or delivery and agree that "if and when reflected" they are sufficient to attract business to the favored purchasers and away from their competitors so as to force the latter to resell such products at substantially reduced profit. The Commission concluded that the practice was in violation of the Act.

Under the facts stipulated with respect to this issue substantially the same question as to the sufficiency of the evidence of the effect upon competition involved in the sales of gluten feed and meal is presented. We think, without restatement, that there is proof of a reasonable probability of injury to competition.

*Petitioners' arrangement with Curtiss Candy Company.*

The Commission found that in entering into their arrangement with Curtiss Candy Company for advertising dextrose, petitioners have unlawfully discriminated in favor of one purchaser against other purchasers of a commodity bought for resale, furnishing a service or facility connected with processing and selling such commodities, without according to all purchasers propor-

tionately equal terms in violation of Section 2(e) of the Act.

In 1936 and prior thereto, dextrose, (refined corn sugar), was not largely used by housewives or in industry. Anxious to augment their volume of sales, petitioners entered into an arrangement with Curtiss Candy Company, one of the largest American manufacturers of candy bars. After experimentation, Curtiss undertook the use of dextrose as an ingredient in its products, to advertise the latter as "rich in dextrose" and to attempt to persuade the public of the beneficial quality of the element. This it proceeded to accomplish through nationwide advertising, featuring the presence of dextrose in its candy, spending some $200,000 or more a year in the project. Contemporaneously, petitioners similarly advertised Curtiss candies, emphasizing their dextrose content, expending in three years for this purpose some $750,000. In the years during which this advertising continued, the purchases of dextrose by Curtiss from petitioners increased over five-fold and those of glucose from nothing in 1937 to over 14 million pounds in 1939. During all this period petitioners were selling substantial quantities of dextrose to other candy manufacturers who were in competition with Curtiss without making or offering them, or all of them at any rate, any proportionately equal terms. Rather, they "instructed their salesmen to advise customers to whom they sold products to be used in the manufacture of confectionery that we do not contribute to advertising done by customers."

Petitioners do not challenge the basic facts underlying the order in this respect but attack the validity of the ultimate finding of unlawful discrimination. They contend (1) that the transaction was not made with Curtiss as a purchaser; (2) that Curtiss bought no commodity for resale either with or without processing; (3) that there is failure of proof of discrimination between purchasers for resale; (4) that they did not furnish facilities connected with the processing, handling, or reselling of dextrose by Curtiss; (5) that the proof fails to show that petitioners failed to accord such arrangement to other purchasers on proportionately equal terms, and, finally, that there is no proof of sale to Curtiss in interstate commerce.

There is no express agreement that preferences to Curtiss were to be any part of the project. But the expenditure of $750,-

000 in advertising Curtiss candies and the dextrose in them, with the proof of voluminous increase of purchases, not only of dextrose but of glucose, by Curtiss during this period is amply sufficient to support the inference of the Commission that the arrangement was made with Curtiss for the purpose of building up petitioners' sales of dextrose to it and to others and resulted in vast expenditures by petitioners for the sole benefit of Curtiss to the detriment of other competing purchasers.

The statute forbids furnishing preferential services or facilities "connected with" processing and selling a commodity. It applies where the commodity is bought for resale "with or without processing." Petitioners argue that when dextrose becomes part of a mixture, its identity ceases, being merged in the composite product, and that it is, therefore, beyond the definition of commodities affected by the Act and embraced in the words "with or without processing." Obviously in manufacture of finished products, in the compounded result, many ingredients lose their identity. Dextrose, constituting from 5 to 90 per cent of the product when it emerges in candy, is not capable of being isolated thereafter except by chemical reduction. But processing is a relative term. It embraces many modes of treatment of various materials to produce given results. It is an act or a series of acts with regard to the subject matter in its transformation into a different state or a different thing. It effectuates change in form, contour, chemical combination, physical appearance or otherwise by artificial or natural means and, in its more complicated form, involves progressive action in performing, producing or making something. Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139; Sharpless Co. v. Crawford Farms, 2 Cir., 287 F. 655; Bedford v. Colorado Fuel & Iron Corp., 102 Colo. 538, 81 P.2d 752, 757. We think that when Curtiss made its product, it changed the form of the dextrose used, in a progressive series of steps involved in making candy, so treating the material as to produce a desired given result, eventuating in a different state or thing. The advertising paid for by petitioners informed the public that Curtiss candy was "a blending of dextrose" with other such ingredients as chocolate, butter and milk. We think Congress, when it forbade extension of special facilities to one purchaser not accorded to others, intended to forbid special favors to one purchaser over competitors in all cases where goods are sold and resold without processing or are included in a processed product. Congress evidently contemplated that when a product is purchased, it may either be consumed by the purchaser or resold by him in its original form or after having been made a part of a compounded product. Evidently Congress employed the words "with or without processing" as an all comprehensive term. This conclusion seems inevitable when one considers the purpose of the legislation. Consequently the reasoning of Fleming v. Hawkeye Pearl Button Company, 8 Cir., 113 F.2d 52, is not applicable. There the court was dealing with an entirely different problem; an entirely different statute, having entirely different purposes. The court's reasoning obviously rested upon the congressional purpose involved in that specific statute. It does not apply to the Act with which we are concerned here.

The contention that no proof of discrimination between purchasers of dextrose for resale exists is closely related to petitioners' first assertion that the arrangement was not made with Curtiss as a purchaser for resale. In this connection petitioners insist that there is no proof that dextrose purchased by other candy manufacturers was bought for resale. But the record discloses that prior to 1936 dextrose was not well known to the confectionery industry and that experimentation, research and advertising produced a demand for it, and, further, that large quantities were bought by candy manufacturers, competitors of Curtiss, after 1936 and during the period when petitioners were advertising Curtiss' product. The only reasonable inference is that competing candy manufacturers were purchasing dextrose for the very purpose for which Curtiss was purchasing it, in pursuance of the demand built up for dextrose in candy as a result of the advertising of Curtiss and petitioners. There is no requirement in Section 2(e) that there be proof of actual substantial benefit to one or of substantial injury to another of two or more competitors. This paragraph does not require even probability of adverse effect upon competition as does Section 2(a). We think it is satisfied by proof of special services rendered one purchaser not rendered to similar competing purchasers engaged in the same business and using the commodity for the same purpose.

Petitioners claim that they did not furnish facilities in connection with processing, handling or selling dextrose by Curtiss. What we have said demonstrates that this contention can not be upheld, for the record discloses that petitioners did furnish the advertising for the benefit of Curtiss who was a steady and growing purchaser of dextrose from petitioners, and to it alone.

Petitioners assert that there is no proof that they failed to offer the same arrangement to other persons on a proportionally equal basis. We find no evidence that similar services, terms or facilities were accorded to other purchasers.

■ As to the assertion that there is no proof that dextrose was sold to Curtiss in commerce, it is sufficient to observe that petitioners sold the product to purchasers located throughout the United States and shipped it in interstate commerce to such purchasers; that there was competition in commerce between Curtiss and other manufacturers of candy bars; that Curtiss' business and that of petitioners' are of interstate and national character and that the transactions in quesion were part and parcel of interstate commerce and directly affected such commerce.

### Sales to Huron Milling Company and Keever Starch Company.

■ After the Huron Milling and Keever companies had ceased manufacture of pearl starch, petitioners produced for them their requirements of that commodity and sold it to them at prices below the cost at which they could have manufactured it. Each agreement provided for sale of the requirements of the purchasing company and ran for fifteen years. The parties stipulated that these contracts obligated the two companies to refrain from using, receiving or delivering any starch or starch products manufactured by competitors of petitioners. The Commission directed petitioners to cease and desist. They have not sought to set this portion of the order aside but respondent seeks to have it enforced.

Petitioners assert that they and the two companies have already agreed to eliminate the covenant to purchase entire requirements from petitioners and the latter insist, therefore, that they have not disobeyed the order with respect to these contracts. But there is no proof of this averment; no showing of desistance or compliance. The claim merely presents a question of fact without any showing in the record to justify any review by us.

Furthermore, the mere discontinuance, were it proved, would not justify us in refusing to enforce the order. Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326; Bunte Bros. v. Federal Trade Commission, 7 Cir., 104 F.2d 996; Sears, Roebuck & Co. v. Federal Trade Commission, 7 Cir., 258 F. 307, 6 A.L.R. 358; Hershey Chocolate Co. v. Federal Trade Commission, 3 Cir., 121 F.2d 968.

### Differentials arising from sizes of shipping containers.

■ Petitioners shipped its products to its customers in carload lots, tank truck loads, returnable steel drums, barrels, half barrels, 10-gallon kegs and 5-gallon kegs. An established differential in prices existed, dependent upon the size of the containers, the additional price per 100 weight over tank car prices being as follows: when shipped in tank trucks of the customer, 2 cents; when delivered by petitioners' equipment, 10 cents; when shipped in returnable steel drums, when there is no return freight paid, 13 cents; when the return freight on the empty drum is between 50 cents and 75 cents per hundred, 18 cents; when it is between 76 cents and 90 cents per hundred, 23 cents; when it is between 91 cents and $1, 28 cents; when the return freight on the empty drum is more than $1 per hundred, 33 cents; 5-gallon kegs $1.08; 10-gallon kegs 98 cents; half barrels 56 cents; barrels 33 cents. This is the only evidence submitted upon this issue and upon it the Commission found petitioners guilty of unlawful discrimination.

The evidence is merely that the smaller the container the greater proportionately the cost. There is nothing to show that this resulted in any discrimination among competing purchasers other than to create such differences as normally arise in buying in smaller quantities or in larger quantities. We think the facts furnish no basis whatever for any sound inference of violation of the law in this respect.

We conclude that in all respects other than alleged discriminations arising from sales in different size containers, the findings and conclusions of the Commission are amply justified; that as to the different prices of different size containers there is no evidence to justify the Commission's

conclusion. Accordingly the order is modified by eliminating that portion. In all other respects it is affirmed and enforced. Petitioners' prayer to vacate the order is denied in all respects other than as to goods sold in different size containers.

Judgment in accord with our conclusions may be submitted.

MAJOR, Circuit Judge (concurring in part and dissenting in part).

I concur in all respects except as to the holding that petitioner's delivered price is a discrimination in violation of § 2(a) of the Clayton Act as amended. As to this I dissent, for the reason that a delivered price predicated upon use of the basing point price system does not, in my opinion, come within the proscriptions of the section. My views in this respect have been expressed in the dissent which I have filed in Staley Manufacturing Company v. Federal Trade Commission, 144 F.2d 221.