INDIANA DEPARTMENT OF STATE REVENUE, Appellant (Defendant Below),

v.

CAVE STONE, INC., Appellee (Plaintiff Below).

INDIANA DEPARTMENT OF STATE REVENUE, Appellant (Defendant Below),

v.

MESHBERGER STONE, INC., Appellee (Plaintiff Below).

No. 2–1278A433.

Court of Appeals of Indiana, Second District.

Aug. 28, 1980.

---

Theodore L. Sendak, Atty. Gen., Wallace T. Gray, Deputy Atty. Gen., Indianapolis, for appellant.

Michael R. Fruewald, Indianapolis, for appellee.

SHIELDS, Judge.

The Indiana Department of State Revenue (Department) appeals the decision of the trial court ordering a refund of state gross retail tax and use tax (sales and use tax) paid on the purchase of transportation equipment and supplies, repairs, and fuel used in connection with the equipment.

Appellees Cave Stone, Incorporated (Cave) and Meshberger Stone, Incorporated (Meshberger) are engaged in the business of selling sized aggregate stone removed from their respective quarries. The procedure involves stripping, drilling, blasting, and loading the crude stone into a truck. The crude stone is then hauled from the blasting area to the primary crusher (hauling crude stone). Thereafter the crude stone is crushed, separated, washed, and screened into various grades of aggregate. The graded stone is next taken by conveyor to a front-end loader which loads it onto a truck which carries it to separated stockpiles (stock out) from which it is eventually sold. Stockpiling serves a dual purpose. It (1) preserves the grading of stone and prevents commingling, and (2) allows moisture to drain and evaporate from the washed stone, thereby reducing moisture levels to a standard generally acceptable to stone purchasers.

This controversy involves two of the procedures: hauling crude stone and stock out.

Cave and Meshberger on October 29, 1975, after protest and assessment, paid sales tax with interest and penalty on equipment and supplies purchased for the hauling of crude stone, as follows:

| | Cave | Meshberger |
|----------|------------|------------|
| 1971 | $ 541.21 | $ 447.48 |
| 1972 | 186.91 | 364.25 |
| 1973 | 6,062.05 | 706.26 |
| | $6,798.17 | $1,518.00 |
| Interest | 688.95 | 212.16 |
| Penalty | 679.82 | 151.80 |

1. The Meshberger Findings of Fact, Conclusions of Law and Judgment were identical to Cave's except for the substitution of "Meshber-

On October 29, 1975 they also paid, after protest and assessment, sales tax with interest and penalty on equipment and supplies purchased and used in the stock out phase, as follows:

| | Cave | Meshberger |
|----------|------------|------------|
| 1971 | $ 615.94 | $ 670.86 |
| 1972 | 616.56 | 540.17 |
| 1973 | 408.56 | 743.92 |
| | $1,641.06 | $1,954.95 |
| Interest | 258.60 | 288.86 |
| Penalty | 164.11 | 195.50 |

Cave and Meshberger filed a timely claim for refund which was denied by Department. A timely suit was then commenced in the trial court. The separate suits of Cave and Meshberger were consolidated for all purposes.

As to Cave,[1] the trial court specially found:

"8. The hauling crude stone activity in Cave's operation consisted of the hauling by truck of crude stone from a front-end loader in the blasting area to a funnel-type bin which feeds the crusher. The purchases upon which the Department assessed tax in the hauling crude stone activity were purchases of two trucks and fuel, tires, repairs, and replacement parts for three trucks used for hauling.

"9. Up to 3 trucks were used for hauling crude. Each truck used for hauling had special tires of appropriate size and tread for its particular use at Cave's plant and was used almost exclusively for hauling crude stone although it could be used for hauling stock out and clean-up. The trucks were not and could not be licensed for use on public highways.

"10. The distance travelled by trucks hauling crude stone varies depending on the location of work in the quarry, but was not more than ½ mile. Neither the trucks nor the crusher feeder bin were

ger" for "Cave" and the substitution of the appropriate amounts for taxes, interest, and penalty paid.

used for storage of crude stone. No crude stone was loaded into a truck unless it was to be transported to the crusher feeder bin and crushed immediately thereafter.

"11. Cave never sold crude stone direct from the quarry to customers. There was no market or commercial use for such crude stone. The stone became a marketable product only after further steps of crushing, screening, washing and sizing had occurred.

"12. The stock out activity in Cave's operations consisted of the movement of crushed and graded stone to separate stockpiles. Equipment used in this step included conveyors from the end of the grading step to the outside of the building, at least one front–end loader, and truck(s). The purchases upon which the Department assessed tax with respect to the stock out activity were fuel, tires, repairs, and replacement parts for that equipment.

"13. The conveyors and trucks used in stock out were used for no other purposes.

"14. Stockpiles of crushed, graded and washed stone were stored in cone shaped piles in the stock out activity. Storage of processed stone in the stockpiles is necessary to preserve the grading of the stone and to prevent comingling [sic] of the grades of aggregate in the separate stockpiles.

"15. Stockpiling of stone allowed moisture to drain and evaporate from the washed stone so that moisture levels were reduced to levels generally accepted by stone purchasers as standard. Many purchasers, including the State of Indiana, specifically required stone which had been stockpiled for a specified period, and some customers sought adjustments in price if stone purchased had excess moisture due to insufficient time in stockpile.

"16. The hauling crude stone step constituted transportation of unfinished work in process in a continuous flow from one production step to another within Cave's integrated operations.

"17. The materials transported during the stock out step had not yet been altered to their final, most marketable form, which was accomplished through drainage in stockpiles. Therefore, the stock out step also constituted transportation of unfinished work in process in a continuous flow from one production step to another in Cave's operations."

Based on the findings the court entered, in part, the following conclusions of law:

"3. Cave's delayed payment of the sales and use tax involved in this action was due to a bona fide interpretation of the tax statutes supported by prior administrative practice and was not due to negligence or intentional disregard of the law. Therefore, no penalties should have been assessed against Cave on account of deficiencies asserted by the Department, regardless of the validity of the deficiencies, and Cave is entitled to a refund of such penalties paid with interest. .

"4. The machinery, parts and related items used by Cave in its hauling crude stone and stock out steps were directly used by Cave in the direct production, manufacture, mining, processing or finishing of tangible personal property within the terms of Section 39(b)(6) of the Gross Income Tax Act of 1933, Ind.Code § 6–2–1–39(b)(6) (1976). Cave's purchases of that machinery, parts and related items are therefore exempt from the imposition of the Indiana gross retail tax.

"5. The Department's Regulations 39–600, 39–610, and 39–620, 1 Burns Ind. Adm.R. & Regs. (6–2–1–39)–15, –16, –17 (Code Ed.1976), are inapplicable to transactions occurring before their effective date of April 24, 1972. The Court concludes that the entire operations of Cave described above constitute 'production' or 'processing' of tangible personal property as defined in Regulations 39–600 and 39–620, and that the hauling crude stone and stock out steps constitute exempted transportation under those two regulations. However, to the extent that any of the regulations cited above, or portions of those regulations, would require a re-

sult contrary to that expressed in Conclusion No. 4 in the circumstances presented here, those regulations or portions are invalid as contrary to the enabling statute.

"6. Cave is entitled to a refund of gross retail tax, interest, and penalties paid with respect to its hauling crude and stock out steps, as set forth above, plus interest at 6% from the date of payment to the date of judgment."

Judgment was entered for Cave in the amount of $10,230.71 plus prejudgment interest of $1,636.91. Meshberger received $4,321.27 plus prejudgment interest of $691.40.

We affirm in part and reverse in part.

Department asserts the trial court erred:

(1) in finding the machinery, parts and related items used by Cave and Meshberger in the hauling crude stone and stock out procedures were exempt from sales and use tax by IC 6–2–1–39(b)(6) (Burns Code Ed., Supp.1979) and applicable Department regulations;[2]

(2) in declaring applicable Department regulations invalid insofar as they require a finding that the contested items were not exempt from the sales and use tax;

(3) in finding the delayed payments were not due to negligence or intentional disregard of the law; and

(4) in finding Cave and Meshberger were entitled to a refund.[3]

I

IC 6–2–1–39(b)(6) reads as follows:

"(b) Nor shall the state gross retail tax apply to any of the following transactions. . . .

(6) Sales of manufacturing machinery, tools and equipment to be directly used by the purchaser in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining or finishing of tangible personal property; . . . ."

The Department takes the position IC 6–2–1–39(b)(6) requires the purchased machinery, tools, and equipment must directly effect a change in the basic material substance in production to qualify for exemption.

Cave and Meshberger argue the equipment is exempt because it directly contacts and moves the stone during its processing. They contend the decision of the trial court is supported by the plain meaning of the statute, by recent Indiana decisions exempting such transportation equipment, by the Department's own regulations, and by well–reasoned authorities from other jurisdictions.

This Court, in examining the provisions of IC 6–2–1–39(b)(6), has declared its language ambiguous.

"Although we doubt simple disagreement always signifies ambiguity, certainly the well reasoned opposing interpretations in the case at bar are persuasive in suggesting that 'directly used by the purchaser in the direct production . . . of tangible personal property' is ambiguous.

"The conflicting conclusions courts of other states have reached in interpreting similar exemptions for sales of things used 'directly' in manufacturing is further indication of the word's ambiguity."

*Indiana Dept. of St. Rev., Sales Tax Div. v. RCA Corp.,* (1974) 160 Ind.App. 55, 59, 310 N.E. 2d 96, 99. This case held environmental control equipment (air conditioning which was an integral and essential part of RCA's color picture tube manufacturing process) was not directly used in the direct manufacture of the color television tubes.

■ Because it is an exemption statute, the ambiguity must be construed against the taxpayer. More than a century ago the Indiana Supreme Court in *Conklin v. Town of Cambridge City,* (1877) 58 Ind. 130, 133, said:

---

**2.** Ind.Admin.Rules & Regs. (6–2–1–39)–15 and 17 (Burns Code Ed.)

**3.** This claimed error is subsumed by (1), (2), and (3) and will not be separately addressed.

"Exemptions from taxation are not, and ought not to be, especially favored by the courts; and where such an exemption is claimed, the party claiming the same must show a case, by sufficient evidence, which is clearly within the exact letter of the law."

Cave has directed our attention to cases from other jurisdictions in which there are similar sales and use tax exemptions albeit they contain only the word "directly." This distinction, however, is critical.

Judge White, in analyzing the statute and case law of other jurisdictions, observed in *RCA Corp.*, 160 Ind.App. at 61–62, 310 N.E.2d at 100:

"We have carefully read and considered those cases and remain unconvinced that it was the intent of the Indiana General Assembly to give such a broad meaning to the words '*directly* used . . . in the *direct* production.'

"Indiana was years behind most other states in enacting a sales tax statute. It had the benefit of other states' experience in judicial interpretation of the exemptions, including the manufacturing exemption. The Indiana Legislature wrote in its exemption in words different from those used in any statute construed in the cases . . . we have read. Indiana requires that for the sale to be exempt the property purchases must not only be 'used directly' in the manufacturing process (as do the statutes of other states) but that it must be '*directly* used . . . in the *direct* production, manufacture, etc.

"This repetition of the requirement that the use be direct cannot be treated as surplusage unless no other course is open. . . . Since it is reasonable to assume that the legislative purpose in repeating the directness requirement was to avoid what may have been considered overly broad judicial construction of the single directness requirement in other

states, we feel obliged to give it the narrow construction we have indicated."

Unquestionably the trucks and other transportation devices used by Cave to transfer the crude stone to the crusher and from the crusher to the stockpiles are an essential and integral part of the procedures by which the unquarried stone is transformed into a marketable product. However, that fact is not determinative of their exempt status. *RCA Corp.* Rather, the issue is whether the transportation of the product is a direct use in the direct mining and processing of the sized aggregate stone.

■ The applicable statute exempts certain purchases in the categories of production, manufacture, fabrication, assembly, extraction, mining, processing, refining or finishing. In examining this statute and its categories of exempt procedures, we give meaning to each separate category.[4] Hence, to the extent a particular procedure falls within a definite exemption category, that category is exclusive. It is therefore appropriate and necessary to categorize the operations of Cave and Meshberger.

The parties describe the initial steps of Cave and Meshberger as stripping, drilling, and blasting. These steps fall within the plain meaning of the term "mining." The verb "mine" is defined in Webster's Third New International Dictionary 1437 (Unabridged ed. 1976):

"to get (as ore, metal or other natural constituent) from the earth (as by digging, blasting or pumping)."

■ Hence, purchases directly used in the direct mining of tangible personal property (quarry stone) are exempt. However, the mining exemption concludes at the point in time when the mining (*i. e.*, the removal of the stone from the ground) is completed. Thereafter, the subsequent steps must fall within another exempt category for the benefit to apply.

The term "processing" has been defined as:

4. Ind.Admin.Rules & Regs. (6–2–1–39) - 16 (Burns Code Ed.), filed April 24, 1972, specifically deals with the extraction or mining phase. By definition contained within the regulation

(Rule [6–2–1–39] –16 III.A) that phase concludes when the item has been physically removed from the quarry. The focus then shifts to Rule 17 which encompasses processing.

"[P]rocessing is a relative term. It embraces many modes of treatment of various materials to produce given results. It is an act or a series of acts with regard to the subject matter in its transformation into a different state or a different thing. It effectuates change in form, contour, chemical combination, physical appearance or otherwise by artificial or natural means . . . . ."

*Corn Products Refining Co. v. F. T. C.,* (7th Cir. 1944) 144 F.2d 211, 219 (citations omitted), *affirmed,* 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320.

■ Thus, the term "processing" connotes an operation which places the product in a different form, composition, or character. The processing of the quarried rock commences when it is placed in the crusher. We *assume,* but do not decide, that processing occurs by the natural occurrence of the drainage and evaporation of moisture while the rock is stockpiled. Nevertheless, we hold the equipment, supplies, and repairs used in hauling crude stone and in stocking out are not directly used in the direct mining and processing of the stone. While the transportation of quarried stone to the crusher and the stockpiles is an essential integral part of a final marketable product, no direct mining or processing occurs during the transportation. Transportation equipment which merely serves as a means for a product to go from one step to another does not have a positive effect and causal relationship to the production of the graded stone. We hold "directly used in direct processing" requires the transportation equipment be an integral part of a process which is ongoing during the transportation. Here the stone, while being transported, remains unaffected by processing.

In *State v. Farmers Tankage, Inc.,* (1969) 144 Ind.App. 392, 246 N.E. 2d 409, a truck used to collect dead animals used in the manufacturing of animal and poultry feed was held tax exempt by this court. However, the statutory exemption therein involved read:

5. These rules and regulations, Ind.Admin.Rules & Regs. (6–2–1–39) 15 and 17 were not filed

"(b) Nor shall the state gross retail tax apply to any of the following transactions:

"(1) Sales to farmers and other persons occupationally engaged in the business of producing food and commodities for human, animal or poultry consumption either for sale or further use in producing such food and commodities for sale, of animal and poultry life to be used by the purchaser for such production of food and commodities, feed for such animals and poultry and seeds, plants, fertilizers, fungicides, insecticides and other tangible personal property to be used for such production of food and commodities."

*Id.* at 393, 246 N.E.2d at 410. *Farmers Tankage, Inc.* illustrates the significance of the double direct requirement.

■ Thus, conceding only for the purposes of argument the stone undergoes processing in the stockpile in that it drains, nevertheless, it is not undergoing processing while it is being transported. It does not undergo any change in form, contour, chemical combination, physical appearance, or otherwise.

Therefore, we reverse the trial court's decision that the purchases were exempt from sales and use tax.

## II

The trial court held the subject purchases were exempt from the sales tax by certain rules and regulations of Department.[5] However, the trial court further held those same regulations invalid as contrary to the enabling statute to the extent, if any, the regulations would deny the subject purchases tax–exempt status.

■ Department contends the subject purchases are taxable under its regulations; Cave and Meshberger contend the purchases are exempt. We, however, do not need to examine the particular regulations to determine what status they give the purchases. As we hold the statute imposes the tax and does not exempt the subject pur-

until April 24, 1972 and hence are applicable only to any tax thereafter accrued.

chases, the regulations must likewise tax the purchases. If they do not, the regulations are invalid.[6]

In *Indiana Dept. of State Revenue v. Sohio Petro. Co.*, (1976) Ind.App., 352 N.E.2d 95, at 101, this Court recognized that

> "Our Supreme Court in *Baker v. Compton*, (1965) 247 Ind. 39, 211 N.E.2d 162, noted that an incorrect interpretation of a statute by an agency charged with administering the statute is not binding on an appellate court despite the axiom that such a court should give great weight to such an interpretation. And the Department lacks statutory authority to establish rules that add or detract from the Act."

*See also Gross Income Tax Division v. Colpaert Realty Corp.*, (1952) 231 Ind. 463, 109 N.E.2d 415; *Mobley v. City of Evansville*, (1960) 130 Ind.App. 575, 167 N.E.2d 473.

Therefore, the trial court erred in its finding and conclusion that administrative rules and regulations of the Department exempted the subject purchases or were invalid in not exempting them.

### III

■ The trial court did, however, correctly conclude that Cave and Meshberger de-

layed payment of the sales and use tax due to a bona fide dispute over the interpretation of applicable tax statutes and not from negligence or intentional disregard of the law.

Department argues IC 6–2–1–16(f) (Burns Code Ed.)[7] imposes a penalty for late payment without consideration of possible negligence or intentional disregard of the law. Cave and Meshberger filed returns and paid sales and use tax in each of the taxable years at issue. The amounts upon which penalties were assessed were amounts later calculated by Department as deficiencies and assessed after protest. Hence, they argue, IC 6–2–1–16(f) is inapplicable and penalties would have to be justified under IC 6–2–1–16(d).[8] Subsection (d) provides a penalty only where the deficiency is due to negligence or intentional disregard of the tax laws, rules, or regulations.

The court has recently decided this issue favorably to the action of the trial court. In *Indiana Department of State Revenue v. Harrison Steel Castings Co.*, (1980) Ind. App., 402 N.E.2d 1276, this court said:

> "We think that IC 6–2–1–16(f), in referring to a failure to pay tax, does not refer to items that the taxpayer in good faith and within a reasonable basis does

---

**6.** We do note, however, that Rule (6–2–1–39) 15 is inapplicable because by definition its applicability ceases when the stone is removed from the quarry. Rule (6–2–1–39) 17 III.C.3 would not exempt the transportation equipment. It exempts transportation equipment used to transport work from one processing step to another processing step. As we have explained, the subject equipment does not meet this requirement.

**7.** IC 6–2–1–16(f) (Burns Code Ed.) states:

> "If any taxpayer fails to file a return or to pay tax within the time prescribed by this chapter, the department shall add to the tax of such person ten percent [10%] thereof as a penalty. However, such penalty shall in no case be less than two dollars [$2.00]. If any person fails to file a return as required by section 15(a) [6–2–1–15(a)] of this chapter in cases where his gross income is one thousand dollars [$1,000] or more, even though no tax be due, a specific penalty of two dollars [$2.00] shall be assessed. If, how-

ever, a return is filed or the tax is paid within thirty [30] days after the date specified for filing the return, and it is shown by affirmative evidence satisfactory to the department that the failure to file such return or to pay such tax within the time specified in this chapter was due to a reasonable cause, such penalty may be waived."

**8.** IC 6–2–1–16(d) states:

> "If any part or all of the deficiency is due to negligence or intentional disregard of this chapter or of authorized rules and regulations, but without intent to defraud, there shall be added as a penalty, ten percent [10%] of the total amount of the deficiency in the tax, and interest in such case shall be collected at the rate of eight percent [8%] per annum on the amount of such deficiency in the tax from time it was due, which interest and penalty shall become due and payable upon notice and demand by the department."

not include as taxable under the sales and use tax."

*Id.* at 1278.

Thus this Court refused to categorize good faith disputes within subsection (f) and to nullify subsection (d). We agree. We, therefore, affirm the decision of the trial court on this issue.

Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.

SULLIVAN, J., concurs.

BUCHANAN, C. J., concurs and dissents by separate opinion.

BUCHANAN, Chief Judge, concurring in part and dissenting in part.

I dissent as to Issue One and Two because I believe the majority has too narrowly construed the terms of Ind. Code 6–2–1–39(b)(6), which reads in part:

(b) Nor shall the state gross retail tax apply to any of the following transactions:

(6) Sales of manufacturing machinery, tools and equipment to be *directly used by the purchaser in the direct production,* manufacture, fabrication, assembly, extraction, mining, *processing,* refining or finishing of *tangible personal property*; sales of agricultural machinery, tools and equipment to be directly used by the purchaser in the direct production, extraction, harvesting or processing of agricultural commodities; and sales of tangible personal property to be directly used by the purchaser in the direct production or manufacture of any such manufacturing or agricultural machinery, tools and equipment.

(Emphasis added).

The majority concludes that trucks and other transportation equipment are not "directly" used in the "direct" processing of the stone. Although I would rationalize that transportation equipment is directly used in the direct *"processing"* of the stone, perhaps an even stronger argument can be made that this equipment is directly used in the direct *"production"* of marketable stone.

The trucks used in hauling the stone seem to me to be directly used in the direct production of the stone. In considering the plain meaning of the language used, *State ex rel. Bynum v. LaPorte Superior Court* (1973), 259 Ind. 647, 291 N.E.2d 355, the word "production" as used in the context of this statute has been variously defined as:

In an economic sense, production includes all activity directed to increasing the number of scarce economic goods. It is not simply the manual, physical labor involved in changing the form or utility of a tangible article.

*Borden Co. v. Borella* (1945), 325 U.S. 679, 683, 65 S.Ct. 1223, 1225, 89 L.Ed. 1865, 1869.

Production: something that is produced naturally or as a result of labor and effort; the act or process of producing, bringing forth or making; the creation of utility, the making of goods available for human wants.

*Webster's Third Law International Dictionary* 1810 (unabridged ed. 1971).

The majority sets forth a test which the equipment must meet in order to be exempt. I believe that the transportation equipment under consideration here satisfies their test, which requires that before the equipment may be tax exempt it must be "an integral part of a process which is on–going during the transportation." It appears to me that while the stone is being transported the transportation equipment is being *directly* used in the *direct* production of the marketable stone. The majority does admit the transportation equipment is "an essential and integral part of the procedures by which the unquarried stone is transformed into a marketable product."

So I would conclude that because the transportation equipment is essential and integral to the production of the stone, it should be tax exempt. Any other view lets the genie out of the bottle–it will be virtually impossible for taxpayers and taxing authorities to determine what is "directly" used in "direct" processing, manufacturing, or production.

Because the transportation equipment is an essential and integral part of the production of the marketable stone, it can be distinguished from the air–conditioning equipment in *Indiana Department of Revenue v. RCA Corp.* (1974), 160 Ind.App. 55, 310 N.E.2d 96. The role of air conditioning in effecting air quality control for the production of television tubes is certainly more remote and indirect.

Another test which the Indiana Court of Appeals has used to decide if equipment is tax exempt is stated in *Indiana Department of Revenue v. Harrison Steel Castings Co.* (1980), Ind.App., 402 N.E.2d 1276. This case requires that the questioned purchase must have a "positive effect and active and causal relationship to the production of the product." Ind.App., 402 N.E.2d at 1278. The court in *Harrison* held that the safety helmets worn by the employees in its steel casting business did not satisfy this test. But the trucks purchased here can be distinguished from the safety helmets because the use of the trucks directly affect in a positive and causal fashion the production of marketable stone.

My view finds succor in *Indiana Department of Revenue v. American Dairy of Evansville, Inc.* (1975), 167 Ind.App. 367, 338 N.E.2d 698, which held that milk cans that were used by the manufacturer to hold, measure and convey the raw materials were directly used in the direct production of milk. *See also Indiana Department of Revenue v. Mumma Brothers Drilling Co.* (1977), Ind.App., 364 N.E.2d 167. In *American Dairy* our court said:

> [E]ven the most narrow reading of the foregoing subsections of IC 1971, 6–2–1–39, *supra*, fails to support a conclusion that the exemptions provided therein are limited to items and substances contributing to the physical composition of the final product, and no authority has been advanced to support such a construction.

167 Ind.App. at 374, 338 N.E.2d at 702. The rationale of *American Dairy* is more persuasive, and realistic to me than the majority view here. Lines do have to be drawn in the law. As Justice Frankfurter observed in his dissent in *Pearce v. Commissioner*:

In law, as in life, lines have to be drawn. But the fact that a line has to be drawn somewhere does not justify its being drawn anywhere. The line must follow some direction of policy, whether rooted in logic or experience.

315 U.S. 543, 558, 62 S.Ct. 754, 761, 86 L.Ed. 1016, 1025. I find the line to be drawn in this case should be rooted in the logic and experience of the market place. The conveyance of the stone from place to place integrally and essentially is a part of its production or processing. To otherwise draw the line requires the mills of justice to grind too fine.

Thus, I dissent as to Issues One and Two, concur as to Issue Three, and would affirm the entire decision of the trial court.