INDIANA DEPARTMENT OF STATE
REVENUE, Appellant
(Defendant Below),

v.

CAVE STONE, INC., Appellee
(Plaintiff Below).

INDIANA DEPARTMENT OF STATE
REVENUE, Appellant
(Defendant Below),

v.

MESHBERGER STONE, INC., Appellee
(Plaintiff Below).

Nos. 1283S444, 2–1278A433.

Supreme Court of Indiana.

Dec. 14, 1983.

Theodore L. Sendak, Atty. Gen., Wallace T. Gray, Deputy Atty. Gen., Indianapolis, for appellant.

Michael R. Fruehwald, Larry J. Stroble, Indianapolis, for appellees; Barnes, Hick-

am, Pantzer & Boyd, Indianapolis, of counsel.

PRENTICE, Justice.

This cause is before us on the petition of Cave Stone, Inc. and Meshberger Stone, Inc. (Appellees) to transfer the cause from the Court of Appeals, Second District, following its reversal in part (Judge Buchanan, dissenting) of the judgment of the trial court that certain machinery, parts, and related items purchased by the Appellees (Cave and Meshberger) were exempt from the imposition of the Indiana Gross Retail Tax and that the taxpayers were not liable for a penalty.

The decision of the Court of Appeals, reported at 409 N.E.2d 690, was filed on August 28, 1980. Its opinion on petition for rehearing was filed on November 10, 1981 and is reported at 427 N.E.2d 922.

Because we find that the decision of the Court of Appeals conflicts with other decisions of that court, as hereinafter set forth, the petition to transfer is now granted, and the decision and opinion of the Court of Appeals is vacated.

Actions were commenced in the trial court by separate complaints filed by Appellees. The cases were consolidated for trial. Separate judgments were entered and separate motions to correct errors were filed, both of which were overruled. The issues in both cases are identical and have been treated in one appeal which presents the following issues:

1. Whether the trial court erred in finding that machinery, parts and related items used by the Appellees in their hauling crude stone and stock out steps were directly used by the purchaser in the direct production, manufacture, mining, processing or finishing of tangible personal property within the terms of Ind.Code § 6–2–1–39(b)(6) (Burns 1976) and applicable regulations of the Indiana Department of State Revenue, and were, therefore, exempt from the imposition of Indiana Gross Retail tax and the Appellees entitled to a refund of the tax, interest, and penalties paid;

2. Whether the trial court erred in finding that the Appellees' delayed payments of tax were not due to negligence or intentional disregard of the law, and that, therefore, no penalties should have been assessed against them.

The facts giving rise to this cause and the trial court's findings of fact and law were presented by the Court of Appeals as follows:

"Appellees Cave Stone Incorporated (Cave) and Meshberger Stone, Incorporated (Meshberger) are engaged in the business of selling sized aggregate stone removed from their respective quarries. The procedure involves stripping, drilling, blasting, and loading the crude stone into a truck. The crude stone is then hauled from the blasting area to the primary crusher (hauling crude stone). Thereafter the crude stone is crushed, separated, washed, and screened into various grades of aggregate. The graded stone is next taken by conveyor to a front-end loader which loads it onto a truck which carries it to separated stockpiles (stock out) from which it is eventually sold. Stockpiling serves a dual purpose. It (1) preserves the grading of stone and prevents commingling, and (2) allows moisture to drain and evaporate from the washed stone, thereby reducing moisture levels to a standard generally acceptable to stone purchasers.

"This controversy involves two of the procedures: hauling crude stone and stock out.

"Cave and Meshberger on October 29, 1975, after protest and assessment, paid sales tax with interest and penalty on equipment and supplies purchased for the hauling of crude stone, as follows:

| | Cave | Meshberger |
| --- | --- | --- |
| "1971 | $ 541.21 | $ 447.48 |
| 1972 | 186.91 | 364.25 |
| 1973 | 6,062.05 | 706.26 |
| | $6,798.17 | 1,518.00 |
| | | |
| Interest | 688.95 | 212.16 |
| Penalty | 679.82 | 151.80 |

"On October 29, 1975 they also paid, after protest and assessment, sales tax with interest and penalty on equipment and supplies purchased and used in the stock out phase, as follows:

| | Cave | Meshberger |
|---|---|---|
| "1971 | $ 615.94 | $ 670.86 |
| 1972 | 616.56 | 540.17 |
| 1973 | 408.56 | 743.92 |
| | $1,641.06 | $1,954.95 |
| | | |
| Interest | 258.60 | 288.86 |
| Penalty | 164.11 | 195.50 |

"Cave and Meshberger filed a timely claim for refund which was denied by Department. A timely suit was then commenced in the trial court. The separate suits of Cave and Meshberger were consolidated for all purposes.

"As to Cave [1], the trial court specially found:

" '8. The hauling crude stone activity in Cave's operation consisted of the hauling by truck of crude stone from a front-end loader in the blasting area to a funnel-type bin which feeds the crusher. The purchases upon which the Department assessed tax in the hauling crude stone activity were purchases of two trucks and fuel, tires, repairs, and replacement parts for three trucks used for hauling.

" '9. Up to 3 trucks were used for hauling crude. Each truck used for hauling had special tires of appropriate size and tread for its particular use at Cave's plant and was used almost exclusively for hauling crude stone although it could be used for hauling stock out and clean-up. The trucks were not and could not be licensed for use on public highways.

" '10. The distance travelled by trucks hauling crude stone varies depending on the location of work in the quarry, but was not more than ½ mile. Neither the trucks nor the crusher feeder bin were used for storage of crude stone. No crude stone was loaded into a truck unless it was to be transported to the crusher feeder bin and crushed immediately thereafter.

" '11. Cave never sold crude stone direct from the quarry to customers. There was no market or commercial use for such crude stone. The stone became a marketable product only after further steps of crushing, screening, washing and sizing had occurred.

" '12. The stock out activity in Cave's operations consisted of the movement of crushed and graded stone to separate stockpiles. Equipment used in this step included conveyors from the end of the grading step to the outside of the building, at least one front-end loader, and truck(s). The purchases upon which the Department assessed tax with respect to the stock out activity were fuel, tires, repairs, and replacement parts for that equipment.

" '13. The conveyors and trucks used in stock out were used for no other purposes.

" '14. Stockpiles of crushed, graded and washed stone were stored in cone shaped piles in the stock out activity. Storage of processed stone in the stockpiles is necessary to preserve the grading of the stone and to prevent comingling [sic] of the grades of aggregate in the separate stockpiles.

" '15. Stockpiling of stone allowed moisture to drain and evaporate from the washed stone so that moisture levels were reduced to levels generally accepted by stone purchasers as standard. Many purchasers, including the State of Indiana, specifically required stone which had been stockpiled for a specified period, and some customers sought adjustments in price if stone purchased had excess moisture due to insufficient time in stockpile.

" '16. The hauling crude stone step constituted transportation of unfinished work in process in a continuous

---

**1.** The Meshberger Findings of Fact, Conclusions of Law and Judgment were identical to Cave's except for the substitution of "Meshberger" for "Cave" and the substitution of the appropriate amounts for taxes, interest, and penalty paid.

flow from one production step to another within Cave's integrated operations.

"'17. The materials transported during the stock out step had not yet been altered to their final, most marketable form, which was accomplished through drainage in stockpiles. Therefore, the stock out step also constituted transportation of unfinished work in process in a continuous flow from one production step to another in Cave's operations.'

"Based on the findings the court entered, in part, the following conclusions of law:

"'3. Cave's delayed payment of the sales and use tax involved in this action was due to a bona fide interpretation of the tax statutes supported by prior administrative practice and was not due to negligence or intentional disregard of the law. Therefore, no penalties should have been assessed against Cave on account of deficiencies asserted by the Department, regardless of the validity of the deficiencies, and Cave is entitled to a refund of such penalties paid with interest.

"'4. The machinery, parts and related items used by Cave in its hauling crude stone and stock out steps were directly used by Cave in the direct production, manufacture, mining, processing or finishing of tangible personal property within the terms of Section 39(b)(6) of the Gross Income Tax Act of 1933, Ind.Code § 6–2–1–39(b)(6) (1976). Cave's purchases of that machinery, parts and related items are therefore exempt from the imposition of the Indiana gross retail tax.

"'5. The Department's Regulations 39–600, 39–610, and 39–620, 1 Burns Ind.Adm.R. & Regs. (6–2–1–39) –15, –16, –17 (Code Ed.1976), are inapplicable to transactions occurring before their effective date of April 24, 1972. The Court concludes that the entire operations of Cave described above constitute "production" or "processing" of tangible personal property as

defined in Regulations 39–600 and 39–620, and that the hauling crude stone and stock out steps constitute exempted transportation under those two regulations. However, to the extent that any of the regulations cited above, or portions of those regulations, would require a result contrary to that expressed in Conclusion No. 4 in the circumstances presented here, those regulations or portions are invalid as contrary to the enabling statute.

"'6. Cave is entitled to a refund of gross retail tax, interest, and penalties paid with respect to its hauling crude and stock out steps, as set forth above, plus interest at 6% from the date of payment to the date of judgment.'

"Judgment was entered for Cave in the amount of $10,230.71 plus prejudgment interest of $1,636.91. Meshberger received $4,321.27 plus prejudgment interest of $691.40." 409 N.E.2d at 692–694.

## ISSUE I

Ind.Code 6–2–1–39(b)(6) provides in pertinent part:

(b) Nor shall the state gross retail tax apply to any of the following transactions:

\* \* \* \* \* \*

(6) Sales of manufacturing machinery, tools and equipment to be directly used by the purchaser in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining or finishing of tangible personal property;

. . . .

Although the Court of Appeals agreed with the trial court that the trucks and other transportation devices used by Appellees to transfer the crude stone to the crusher and from the crusher to the stockpiles are an essential and integral part of the procedures by which the unquarried stone is transformed into a marketable product, it considered the determinative issue to be "whether the transportation of the product is a direct use in the direct mining and processing of the sized aggre-

gate stone." After holding that the exempt procedures presented in the statute were separate categories and that "to the extent a particular procedure falls within a definite exemption category that category is exclusive," the majority went on to decide that the appropriate category in the case at bar was "processing," a term which "connotes an operation which places the product in a different form, composition, or character." The majority found that the processing of the quarried rock did not commence until it was placed in the crusher and, consequently, held that the equipment, supplies and repairs used in the hauling crude stone and stocking out steps were not directly used in the direct processing of the stone because no direct processing occurred during the transportation, i.e. the stone did not undergo any change in "form, contour, chemical combination, physical appearance, or otherwise."

In its opinion on rehearing the majority determined that neither was the equipment used in the direct *production* of stone. It summarized its position on both processing and production by stating, "The essence of our opinion is the manufacturing equipment must have a transformational effect as opposed to a translational effect for it to be exempt."

 We recognize that exemption statutes are to be strictly construed against the taxpayer, *Gross Income Tax Division v. National Bank & Trust Co.*, (1948) 226 Ind. 293, 298, 79 N.E.2d 651, 653; *Conklin v. Town of Cambridge City*, (1877) 58 Ind. 130, 133; however, we find that the majority has construed this statute too narrowly and that its construction conflicts with that presented in other decisions by the Court of Appeals. The exemption provisions in Ind.Code § 6–2–1–39(b)(6) are not mutually exclusive; rather they provide a comprehensive description of various means of production. The terms used in the statute overlap and at times encompass each other. For example, "production" may include manufacture, fabrication, assembly, processing, refining, and/or finishing. Judge Buchanan's dissent in the instant case provides two definitions of "production" which support this construction of the statute:

'In an economic sense, production includes all activity directed to increasing the number of scarce economic goods. It is not simply the manual, physical labor involved in changing the form or utility of a tangible article. *Borden Co. v. Borella* (1945), 325 U.S. 679, 683, 65 S.Ct. 1223, 1225, 89 L.Ed. 1865, 1869.

'Production: something that is produced naturally or as a result of labor and effort; the act or process of producing, bringing forth or making; the creation of utility, the making of goods available for human wants.' *Webster's Third Law International Dictionary* 1810 (unabridged ed. 1971). 409 N.E.2d at 698.

The statute circumscribes all of the operations or processes by which the finished product is derived. Thus, we find that the production or processing of the stone begins at the time of the initial stripping, drilling, and blasting at the quarry and ends at the time the stone is stockpiled. The production process is continuous and indivisible.

The issue, then, is whether the transportation is an integral part of the production or processing of the stone. We hold that under the facts of this case the equipment was directly used by the Appellees in the direct production, manufacture, mining, processing or finishing of tangible personal property within the terms of Ind.Code § 6–1–2–39(b)(6). The transportation equipment was essential to the achievement of a transformation of the crude stone into aggregate stone; it played an integral part in the ongoing process of transformation. That no specific transformation occurred in the period of time that it was being transported is irrelevant. It is elementary that unless the stone is transported from the quarry to the crusher and from the crusher to the stockpiles, no marketable product will result. In his dissent, Judge Buchanan wrote, "The conveyance of the stone from place to place integrally and essentially is a part of its production or processing. To otherwise draw the line requires the mills of justice to grind too fine." 409 N.E.2d at 699.

Other decisions of the Court of Appeals have also refused to draw the line as nar-

rowly as did the majority in the present decision. In *State Department of Revenue v. Calcar Quarries, Inc.*, (1979) Ind. App. 394 N.E.2d 939 (transfer denied), the First District, on facts very similar to those in the case at bar, held that the trial court did not err in finding that the stock truck and tractor-loaders were used primarily for the purpose of transporting unfinished work in process from one production step to another. Accordingly, the First District held that the trial court was correct in permitting the exemptions for the amounts paid for purchase and repair of these items because they were directly used in direct processing and production. *Id.* at 943.

On rehearing in the present case, the majority stated that it disagreed with the *Calcar* holding to the extent it "(1) recognizes an 'integral operation' exemption that encompasses an overlapping of the enumerated exemptions of I.C. 6–2–1–39(b)(6) and (2) expands the traditional strict interpretation of the statute." 427 N.E.2d at 923.

We believe that the rationale of the First District in *Calcar* is correct. The exemption is provided for "integral operations," and the enumerated exemptions of the statute logically overlap. Further, we do not find that the court's holding in *Calcar* or our holding in the present case expand the traditional strict interpretation of the statute. The First District, in *Calcar*, strictly construed the statute; the majority, in the case at bar, took such strict construction one step further and narrowed it to a breadth that we cannot accept.

The statute provides that the manufacturing machinery, tools and equipment, in order to be exempt, must (1) be directly used by the purchaser and (2) be used in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining or finishing of tangible personal property. In the present case, the transportation equipment in question was directly used by the purchaser, not some other entity, and it was used in the direct production and processing of crude stone into aggregate stone. The transportation equipment moved the unfinished stone in a continuous flow from one production step to another.

We believe that the Court of Appeals, Fourth District, in *Department of Revenue v. U.S. Steel*, (1981) Ind.App., 425 N.E.2d 659 (transfer denied), has determined the correct analysis for construing the statute in question. The court therein strictly construed the meaning of "direct production" and stated that the test for directness requires the equipment to have an "immediate link with the product being produced." The court reasoned:

"Manufacturing equipment may be either directly or indirectly used in production, and the legislature plainly intended to limit the exemption to those items directly a part of production.... Our decisions hold the logical and practical distinction between directness and indirectness can be found where the equipment actually exercised some immediate effect on the product." (citations omitted). "We do not believe this strict construction has defeated the intention of the statute." (citations omitted). *Id.* at 662.

The court further stated that the focus of the analysis should be whether the equipment is an "integral part of manufacturing and operates directly on the product during production." In the *U.S. Steel* case the court found that safety equipment was not only essential and integral to the production of steel but was directly used by the taxpayer in the direct production of steel. The personal protective equipment at issue in the case made production of steel possible, for without it human beings could not participate in the production.

In the present case, the transportation equipment was essential to the job of producing or processing aggregate stone. Inasmuch as the finished product could be produced only if stone were transported from the quarry to the crusher and from the crusher to the stockpiles, the transportation equipment was directly used by the taxpayer in the direct production of aggregate stone.

The *U.S. Steel* analysis is also consistent with the holding of the First District in *Indiana Department of Revenue v. American Dairy of Evansville, Inc.*, (1975) 167

Ind.App. 367, 338 N.E.2d 698 (transfer denied), in which the court found, *inter alia*, that milk cans used by the Dairy to hold, measure and convey raw materials during the production process fell within the exemption provided by Ind.Code § 6-2-1-39(b)(1) (a nearly identical subsection to the one at issue relating to food production) because they were directly used in the direct production of Dairy's food products. *Id.* at 702.

In its opinion on rehearing in the present case, the majority distinguished *American Dairy* from this case by stating that processing of the milk was occurring while it was in the cans; whereas, no processing of the stone was occurring during its transportation. 427 N.E.2d at 922.

If, as the majority held in the case before us, the word "processing" is defined as a contemporaneous physical transformation in the product, there is no citation to any evidence which would support its conclusion that "processing" occurred while the milk was in the cans. The trial court in the *American Dairy* case found only that the containers were used to "hold, measure, and convey." The First District did not require any transformation and found that the cans were directly used in the direct production of the dairy products.

Our holding is not inconsistent with that of the Second District in *Indiana Department of State Revenue v. RCA Corporation*, (1974) 160 Ind.App. 55, 310 N.E.2d 96 (transfer denied). In that case the Court of Appeals held that air conditioning equipment in an RCA plant was not directly used in the direct production of color television picture tubes even though RCA could not economically produce and test color television tubes without the maintenance of the environmental controls in question. The court therein reasoned:

"The very name of the equipment, whether 'air conditioning' or 'environmental control,' signifies that its immediate effect is on the surroundings in which the manufacturing process takes place and only remotely, through the intervening agency of those surroundings, on the tubes or on the process by which they are manufactured." *Id.* at 61, 310 N.E.2d at 100.

We do not find the holding in *RCA* inapposite to our position here. Without the air conditioning equipment, RCA could produce television picture tubes, albeit less economically. However, unless the huge pieces of crude stone, in the case at bar, were transported from the quarry to the crusher and from the crusher to the stockpiles no production of aggregate stone could occur. The equipment had an immediate effect upon the stone. As Judge Buchanan noted in his dissent, the *RCA* case is readily distinguishable from the case at bar because "[t]he role of air conditioning in effecting air quality control for the production of television tubes is certainly more remote and indirect." 409 N.E.2d at 699.

Nor is our holding in the present case in conflict with that in *Indiana Department of State Revenue v. Harrison Steel Castings Co.*, (1980) Ind.App., 402 N.E.2d 1276, in which the First District held that the use of the safety equipment in question was not a "direct use" within the meaning of the statute. In that case the safety equipment was for the "protection of the workers not the creation of a product." The brief opinion in that case does not indicate the exact nature of the safety equipment involved therein, but the court in *U.S. Steel* noted that it was gloves and glasses to protect the workers' eyes from flying debris and hands from rough castings. 425 N.E.2d at 664. Thus, the product could have been created without the safety equipment, whereas in both *U.S. Steel* and the case at bar, no production could have occurred without the exempt equipment.

With respect to the applicable regulations, 39–600 and 39–620 (1 Ind.Admin. Rules & Regs. (6–2–1–39)–15 and 17) (Burns 1976), the trial court found that such regulations were inapplicable to transactions occurring before their effective date of April 24, 1972 and that the operations of the taxpayers constituted production or processing of tangible personal property as defined in the regulations. The trial court further found that to the extent, if any, that the regulations were contrary to the enabling statute, they were

invalid. Inasmuch as we hold that the subject purchases in the case at bar were exempt from the imposition of the tax under Ind.Code § 6–2–1–39(b)(6), it is unnecessary to discuss further the regulations which would, as the trial court noted, be invalid to the extent, if any, that they are contrary to the enabling statute.

### ISSUE II

In that we hold that the Appellees were exempt from paying the taxes at issue, the question of penalties is moot.

The petition to transfer is granted; the decision of the Court of Appeals is vacated, and the judgments of the trial court are affirmed.

GIVAN, C.J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.