**INDIANAPOLIS FRUIT CO., Petitioner,**

v.

**DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–9702–SC–00129.

Tax Court of Indiana.

Feb. 25, 1998.

Rosemary G. Spalding, Spalding & Watson, Indianapolis, for petitioner.

Jeffrey A. Modisett, Attorney General of Indiana, Angela L. Mansfield, Deputy Attorney General, Indianapolis, for respondent.

FISHER, Judge.

Indianapolis Fruit Co. (Indianapolis Fruit) appeals a final determination of the Department of State Revenue (Department) denying it an exemption from certain sales and use taxes for the 1992 through 1995 tax years. Indianapolis Fruit claims that the Department improperly denied it a sales and use tax exemption for certain property purchased or leased during the tax years at issue.

## FACTS

Indianapolis Fruit is a wholesale supplier of fruits and vegetables. Indianapolis Fruit also operates a "Garden Cut" facility. The Garden Cut facility produces freshly cut fruits and vegetables for resale by restaurants and grocery stores. In the course of its wholesale business, Indianapolis Fruit receives fruits and vegetables and distributes them to its customers. Most of these fruits and vegetables require little in the way of processing before resale because they are in a marketable condition when Indianapolis Fruit receives them. This is not the case with bananas and tomatoes; when Indianapolis Fruit receives them, they are not marketable, and they require additional processing to put them into that condition.

### Banana Ripening

Indianapolis Fruit buys bananas in large quantities from various locations in Central and South America. When the bananas arrive, they are green, hard, and inedible, and are not marketable. Soon after Indianapolis Fruit receives the bananas, they are taken directly to the banana ripening area, where they are inspected for pulp temperature, firmness, temperature damage, and overall quality. Once they have been inspected, the bananas are placed in banana ripening booths, which are controlled for temperature, humidity, air circulation, and ethylene gas concentration. Indianapolis Fruit varies these environmental controls depending on the condition of the bananas and the specifications of the customer order to be filled.

Ethylene gas exposure is an important part of the ripening process. If Indianapolis Fruit did not introduce the gas into the banana ripening booths, the bananas would not satisfactorily ripen on their own. Rather, the bananas would turn from green to black, instead of green to yellow. Additionally, the necessary conversion from starch to sugar would not occur, and as a result, the pulp would never have satisfactory taste or texture.

In nature, the bananas themselves produce the ethylene gas that triggers ripening. However, in order to prevent or delay ripening during banana shipments from remote locations, many banana suppliers grow hybri-

dized bananas that do not produce enough ethylene to trigger ripening. Other suppliers chemically induce a state of dormancy in the bananas to prevent premature ripening. In either situation, ripening can only be triggered by introducing ethylene gas into the booths.

While the bananas are ripening in the ripening booths, they are inspected several times each day. Depending on their condition, the bananas may be moved to different ripening booths. The ripening process lasts from four to eight days. Once the bananas are ripened to the customer's specifications, the bananas are shipped.

### Tomato Ripening and Repackaging

The tomato ripening process is in many respects identical to the banana ripening process. However, Indianapolis Fruit does not ordinarily expose the tomatoes to ethylene gas. Instead, Indianapolis Fruit's suppliers usually expose the tomatoes to ethylene gas before shipment. This is done because tomatoes take longer to ripen than bananas and because the tomatoes that Indianapolis Fruit receives are usually grown and shipped from within the United States.

Like the bananas, once the tomatoes arrive, they are inspected for color, firmness, temperature damage, and overall quality. They are then placed in tomato processing units, which are controlled for temperature, humidity, and air circulation. When the tomatoes are adequately ripened, they are either shipped in bulk or further processed by Indianapolis Fruit.

The further processing of some tomatoes is required because some of Indianapolis Fruit's customers order tomatoes packaged by size and ripeness. Indianapolis Fruit washes and dries these tomatoes. They are then sorted by size and ripeness, packaged in styrofoam trays and wrapped in plastic.

### The Garden Cut Facility

Indianapolis Fruit operates a Garden Cut facility where employees clean, cut, and package fruits and vegetables for resale by restaurants and grocery stores. Indianapolis Fruit requires its Garden Cut employees to wear protective clothing to ensure that its facility meets or exceeds applicable state and federal standards concerning contamination of food for human consumption. In addition, several of Indianapolis Fruit's customers regularly inspect the Garden Cut facility to ensure that adequate food sanitation procedures are carried out.

Garden Cut employees who are involved directly with handling food must wear hair restraints, lab coats, vinyl gloves, and neoprene aprons and sleeves. Employees who do not handle the food directly are required to wear hair restraints only. Indianapolis Fruit regularly trains its employees in the prevention of food contamination. It provides training films in both English and Spanish to ensure that all its employees understand food safety. Indianapolis Fruit also has specific disciplinary procedures in place for violations of its food safety policies. Additional facts will be added as necessary.

## PROCEDURAL HISTORY

On December 31, 1995, Indianapolis Fruit filed a claim for refund with the Department alleging that it had paid sales and use tax on certain exempt items for the tax years at issue. The Department conducted a hearing and denied a large part of Indianapolis Fruit's claim in a letter of findings dated November 20, 1996. On February 14, 1997, Indianapolis Fruit filed this original tax appeal as a small tax case, and on June 27, 1997, the parties tried this cause before this Court. At issue in this case is Indianapolis Fruit's contention that it is entitled to a refund of sales and use tax paid on equipment used in the banana and tomato ripening process and the protective clothing worn by Indianapolis Fruit's employees in the Garden Cut facility.

## ANALYSIS AND OPINION

### Standard of Review

■ This Court reviews the Department's final determinations de novo and is bound by neither the evidence nor the issues raised at the administrative level. *See* IND.CODE ANN. § 6–8.1–9–1(d) (West Supp.1997); *Horrall v. Department of State Revenue*, 687 N.E.2d 1219, 1220 (Ind.Tax Ct.1997).

### Discussion and Analysis

■ Indiana imposes an excise tax (gross retail or sales tax) on retail transactions in Indiana. *See* IND.CODE ANN. § 6–2.5–2–1 (West 1989). Indiana also has a complementary excise tax (use tax) on tangible personal property stored, used, or consumed in this state. *See* IND.CODE ANN. § 6–2.5–3–2 (West Supp.1997); *Mid–America Energy Resources, Inc. v. Department of State Revenue*, 681 N.E.2d 259, 261 (Ind.Tax Ct.1997), *review denied; see also USAir, Inc. v. Department of State Revenue*, 623 N.E.2d 466, 468–69 (Ind.Tax Ct.1993) (discussing complementary sales and use taxes). A variety of exemptions from these complementary taxes are available.[1] *See* IND.CODE ANN. §§ 6–2.5–5–1 to –38.2 (West 1989 & Supp. 1997). Like any other exemptions, these exemptions are strictly construed against the taxpayer, *see Sony Music Entertainment, Inc. v. State Bd. of Tax Comm'rs*, 681 N.E.2d 800, 801 (Ind.Tax Ct.1997), *review denied*, and the taxpayer bears the burden of demonstrating entitlement to the exemption. *See id.* However, this Court must avoid reading an exemption provision so grudgingly that the legislative intent and purpose are thwarted. *See Mid–America Energy Resources*, 681 N.E.2d at 261; *Harlan Sprague Dawley v. Department of State Revenue*, 605 N.E.2d 1222, 1225 (Ind.Tax Ct.1992).

Indianapolis Fruit contends that it is entitled to the exemptions contained in sections 6–2.5–5–1 to –3 for its banana and tomato ripening equipment and the protective clothing worn by its employees at the Garden Cut facility. Sections 6–2.5–5–1 and –2 exempt tangible personal property used in agricultural production. Section 6–2.5–5–3 is a more general provision, and is often referred to as the equipment exemption. It exempts manufacturing machinery, tools, and equipment used to produce "other tangible personal property." IND.CODE ANN. § 6–2.5–5–3(b) (West Supp.1997).

■ All three exemption provisions require that the taxpayer engage in production before qualifying for the exemption. *See*

*Mechanics Laundry & Supply, Inc. v. Department of State Revenue*, 650 N.E.2d 1223, 1228–29 (Ind.Tax Ct.1995) (construing section 6–2.5–5–3 as requiring production); *Department of State Revenue v. American Dairy, Inc.*, 167 Ind.App. 367, 338 N.E.2d 698, 700 (1975) (construing predecessor statute to sections 6–2.5–5–1 and –2 as requiring production). Production does not have different meanings under different exemption provisions. *See Citizens Action Coalition, Inc. v. Northern Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 617 (Ind.1985); *Mechanics Laundry*, 650 N.E.2d at 1232 (construing environmental quality exemption, IND.CODE ANN. § 6–2.5–5–30 (West 1989) (amended 1997), in harmony with the industrial exemptions); *Harlan Sprague Dawley*, 605 N.E.2d at 1230 (construing utility exemption, IND. CODE ANN. § 6–2.5–4–5(c) (West 1989) (amended 1993), in harmony with the industrial exemptions). Consequently, as a practical matter, there is little difference between analyzing Indianapolis Fruit's operation under the agricultural exemptions and section 6–2.5–5–3.[2]

Indianapolis Fruit's exemption claims raise two distinct issues. With respect to the banana and the tomato ripening process, the issue is whether Indianapolis Fruit's activities constitute production. With respect to the protective clothing worn at the Garden Cut facility, it is indisputable that the Garden Cut facility is engaged in production. The issue is whether the protective clothing is an integral and essential part of that production. *See* IND.ADMIN.CODE tit. 45, r. 2.2–5–8(c)(2)(F) (1996). Consequently, this Court will analyze these issues separately.

### I. The Banana Ripening and the Tomato Ripening and Packaging

■ In the context of the exemption provisions at issue, production is "defined broadly" and "focuses on the creation of a marketable good." *Mid–America Energy Resources*, 681 N.E.2d at 262 (citing *Department of State Revenue v. Cave Stone*, 457

---

1. The gross retail tax exemptions in chapter 6–2.5–5 of the Indiana Code apply to the tax imposed by section 6–2.5–3–2. *See* IND.CODE ANN § 6–2.5–3–4(a)(2) (West 1989).

2. This Court declines to examine the interrelationship of sections 6–2.5–5–1, –2, and –3 because the parties have not done so in their briefs.

N.E.2d 520, 524 (Ind.1983); *Mechanics Laundry*, 650 N.E.2d at 1229; *Harlan Sprague Dawley*, 605 N.E.2d at 1228). The exemption provisions were enacted to deal with "a host of different activities and factual situations." *Rotation Prods. Corp. v. Department of State Revenue*, 690 N.E.2d 795, 798 (Ind.Tax Ct.1997). As a result, mathematical precision in the application of these exemptions cannot be expected, *see id.*, and any evaluation of whether production is occurring depends on the factual circumstances of the case. However, there is one iron-clad rule: without production there can be no exemption. *See id.*, at 800 (focusing on whether taxpayer's operation produces other tangible personal property); *Mid–America Energy Resources*, 681 N.E.2d at 263 ("[W]hen goods are not 'produced' and a service is provided, the exemption is properly denied."); *Mechanics Laundry*, 650 N.E.2d at 1228–29; *Indiana Waste Sys. v. Department of State Revenue*, 633 N.E.2d 359, 363 (Ind.Tax Ct.1994); *Faris Mailing, Inc. v. Department of State Revenue*, 512 N.E.2d 480, 483 (Ind.Tax Ct.1987). *See also Sony Music*, 681 N.E.2d at 805 (focus under the industrial exemptions is on whether taxpayer produces some form of tangible personal property or merely provides a service).

■ The inquiry does not end once it has been determined that production is taking place. Taxpayers must demonstrate that the items they claim are exempt are integral and essential to that production. *See Cave Stone*, 457 N.E.2d at 524. *See also* IND.ADMIN.CODE tit. 45, r. 2.2–5–8(c) (1996). Often, this determination is made by identifying the points where production begins and where it ends. *See, e.g., General Motors Corp. v. Dept. of State Revenue*, 578 N.E.2d 399, 404 (Ind.Tax Ct.1991) (determining that production ended when taxpayer placed products in their most marketable form), *aff'd*, 599 N.E.2d 588 (Ind. 1992); IND.ADMIN.CODE tit. 45, r. 2.2–5–8(c)(1) (identifying beginning and end of integrated production process).

A finding that production is taking place will often lead to a taxpayer receiving an exemption for activity that, standing alone, does not constitute production. As the Indiana Supreme Court pointed out in *Cave Stone*, the item itself does not have to have a transformational effect on the good being produced in order to be exempt from sales and use tax. It is enough that the item "play[s] an integral part of the ongoing process of transformation." *Id.* at 524. *See also* IND.ADMIN.CODE tit. 45, r. 2.2–5–8(c)(2) (fact that equipment does not cause a change in the product is not determinative). For example, a taxpayer who manufactures clay pipe will receive a sales and use tax exemption for the forklifts that transport unfired pipe from the machine in which it is molded to the kiln in which it is fired. *See* IND.ADMIN.CODE tit. 45, r. 2.2–5–8(f) example 1 (1996). The transportation, in and of itself, does not constitute production, *see Cave Stone*, 457 N.E.2d at 524; however, it is enough that the transportation is an essential and integral part of the production process.

■ This approach reflects economic reality. Modern integrated production processes require the use of a host of items that in and of themselves do not have a transformational effect on the good being produced. To disallow the exemptions on that basis would frustrate the legislative purpose behind exempting tangible personal property "closely connected with the production of goods." *General Motors Corp.*, 578 N.E.2d at 404 (quoting *Department of State Revenue v. Indiana Harbor Belt R.R.*, 460 N.E.2d 170, 175 (Ind.Ct.App.1984)). All parts of an integrated production process are "closely connected with the production of goods" and should therefore qualify for the exemption. With these principles in mind, this Court turns to the facts of the present case.

### a. The Bananas

■ Indianapolis Fruit contends that its banana ripening process constitutes the production of other tangible personal property. Indianapolis Fruit points to the fact that the bananas would never satisfactorily ripen on their own and points to the significant transformational effect of the ripening booths. Indianapolis Fruit also argues that changing unripe non-marketable bananas into ripened marketable products constitutes production within the meaning of the exemptions. The Department counters by arguing that Indianapolis Fruit does not produce bananas, but

"merely controlled the[ir] ripeness before distribution." (Resp't Br. at 4). Moreover, according to the Department, Indianapolis Fruit does not place the bananas in a "form, composition, or character substantially different from that in which [they] w[ere] acquired." IND.ADMIN.CODE tit. 45, r. 2.2–5–10(k) (1996). In the Department's eyes, "a banana remains a banana even though its ripening has been controlled." (Resp't Br. at 6).

Despite the Department's contention, this Court finds that the bananas undergo substantial change as they ripen.[3] The pulp changes chemically from starch to sugar, and the banana peels turn from green to yellow.[4] *Cf. Mid–America Energy Resources,* 681 N.E.2d at 263 & n. 4 (describing changes in the properties of water). Although the ripened bananas are still bananas, they have been placed in a "form, composition, or character substantially different from that in which [they] w[ere] acquired." IND.ADMIN.CODE tit. 45, r. 2.2–5–10(k). They have been transformed both physically and chemically, and this transformation makes a marketable banana from an unmarketable one. Indianapolis Fruit's banana ripening process actively induced this transformation by exposing the bananas to ethylene gas. This is sufficient to constitute production.

Indianapolis Fruit is entitled to a sales and use tax exemption for all items integral and essential to the production of the ripened bananas. The evidence in this case shows that the production process begins with the placement of the bananas in the ripening booths for exposure to the ethylene gas. The production process ends when the ba-

nanas are at their optimal ripeness and have been packaged for shipment. *See* IND.ADMIN.CODE tit. 45, r. 2.2–5–8(d) (1996) (Production "begins at the point of the first operation or activity constituting part of the integrated production process and ends at the point that the production has altered the item to its completed form, including packaging, if required."). Accordingly, Indianapolis Fruit is entitled to a sales and use tax exemption for all items used from the beginning to the end of this integrated production process.

### b. The Tomatoes

The parties make similar arguments with respect to the ripening of the tomatoes. Indianapolis Fruit acknowledges the fact that it does not ordinarily induce the tomato ripening by the introduction of ethylene gas,[5] but argues that the difference is not outcome determinative. Indianapolis Fruit contends that the fact that the tomatoes are ripened (and thus made more marketable) in a "tightly controlled environment" leads to the conclusion that production is taking place. The Department simply repeats the arguments it made with respect to the bananas.

This Court finds that the tomato ripening does not constitute production within the meaning of any of the exemption provisions. It is indisputable that, like the bananas, the tomatoes have undergone a substantial physical and chemical change while ripening. Although this transformation undoubtedly made the tomatoes far more marketable, the transformation was not triggered by Indianapolis Fruit. Instead, it passively awaited the ripening of the tomatoes. The ripening was not actively induced by Indianapolis

---

3. It is immaterial that ripening is a natural process. *See Harlan Sprague Dawley,* 605 N.E.2d at 1226 (expansive definition of production includes natural acts).

4. Not all physical or chemical changes constitute production. *See Harlan Sprague Dawley,* 605 N.E.2d at 1225. For example, where a taxpayer merely returns a good to its original state, production does not occur. *See Mechanics Laundry,* 650 N.E.2d at 1229, 1233. *Compare id. with Rotation Prods.,* 690 N.E.2d at 803–04 (remanufactured article different from article as it was originally manufactured). *See also Indiana Waste Sys.,* 633 N.E.2d at 363 (compressing garbage, in and of itself, does not constitute production).

5. Usually, Indianapolis Fruit's suppliers expose the tomatoes to ethylene gas to trigger the ripening process. This fact does not advance Indianapolis Fruit's cause. In order to qualify for the exemption, Indianapolis Fruit must produce tangible personal property on its own. *See Indiana Waste Sys.,* 633 N.E.2d at 363 (taxpayer may not claim that its activity is part of another taxpayer's production process). *But cf. Energy Supply, Inc. v. Department of State Revenue,* 549 N.E.2d 1110, 1114 (Ind.Tax Ct.1990) (shipment of partially finished product to another taxpayer's plant for further processing does not necessarily end taxpayer's integrated production process where taxpayer retains ownership of the product and supervises the further processing).

**1386** ■

Fruit and was merely incidental to the proper storage of the tomatoes.

To give Indianapolis Fruit the exemption for its tomato ripening equipment would allow Indianapolis Fruit to reap where it has not sown. It would be getting an exemption by virtue of the fact that tomatoes' marketability improved during its possession of them. Undoubtedly, the use of the ripening rooms facilitated the tomatoes' ripening, but this does not alter the conclusion that Indianapolis Fruit's operation with respect to the tomato ripening was essentially passive in nature. It cannot be said that Indianapolis Fruit triggered the tomato ripening. That is the critical distinction between the banana ripening and the tomato ripening.[6] With respect to the bananas, Indianapolis Fruit actively induced the ripening; it did no such thing with respect to the tomatoes. In other words, the difference is that, with respect to the bananas, Indianapolis Fruit *made* something happen; with respect to the tomatoes, Indianapolis Fruit *let* something happen.[7]

■ Likewise, Indianapolis Fruit's tomato packaging does not constitute production. Putting something in a package may be an integral and essential part of an integrated production process. *See, e.g., General Motors Corp.*, 578 N.E.2d at 404; IND.ADMIN.CODE tit. 45, r. 2.2–5–8(d)(1). This, however, does not lead to the conclusion that, in and of itself, packaging constitutes production. In this case, the packaging has not changed the "form, composition, or character" of the tomatoes. IND.ADMIN.CODE tit. 45, r. 2.2–5–8(k). Because there is no production preceding the tomato packaging, the packaging is not an integral and essential part of an integrated production process. Consequently, Indianapolis Fruit is not entitled to the exemption on this basis.

**6.** Another distinction between the banana ripening and the tomato ripening is the fact that the bananas would never have satisfactorily ripened without the exposure to the ethylene gas. It would be incorrect to base this Court's conclusions on that distinction because natural processes may constitute production. *See Harlan Sprague Dawley*, 605 N.E.2d at 1226. That a natural process can happen on its own does not prevent it from constituting production.

## II. The Garden Cut Facility

■ Under Department regulations, a taxpayer is entitled to an exemption for "[s]afety clothing or equipment which is required to ... prevent contamination of the product during production." *Id.* r. 2.2–5–8(c)(2)(F). Indianapolis Fruit contends that the protective clothing worn by its employees is required to prevent contamination. The Department argues that the protective clothing was worn merely for the employee's convenience and therefore was optional. In support of its position, the Department presented testimony from a Department Field Auditor, Randall J. Neff. At trial, Mr. Neff testified that when he toured the Garden Cut facility, he noticed that not all of the employees were wearing the protective clothing.

This Court determines that Indianapolis Fruit is entitled to the exemption for the protective clothing. The evidence presented at trial demonstrated that not all of the Garden Cut facility employees were required to wear the protective clothing because not all of them had direct contact with the processed food. (Trial Tr. at 42). Mr. Neff may have observed employees who were not required to wear the protective clothing. He made no inquiries concerning the duties of the employees who were not wearing the protective clothing. Consequently, this Court has no reason to disbelieve the testimony of Indianapolis Fruit representatives who stated that the items of protective clothing were necessary to prevent contamination and that the items were purchased with the intention of preventing contamination.

## CONCLUSION

For the reasons stated above, this Court now enters judgment in favor of Indianapolis Fruit with respect to the banana ripening equipment and the items of protective cloth-

**7.** The evidence at trial indicated that sometimes Indianapolis Fruit induces the tomato ripening by exposing them to ethylene gas. (Trial Tr. at 21–22). Where this occurs, Indianapolis Fruit is engaged in production. Therefore, Indianapolis Fruit is entitled to an exemption on a prorated basis. *See* IND.ADMIN.CODE tit. 45, r. 2.2–5–8(f) example 5 (1996). The parties, however, presented no evidence at trial that would serve as a basis for prorating the exemption.

ing. This Court enters judgment in favor of the Department with respect to the tomato ripening and repackaging.