**GUARDIAN AUTOMOTIVE TRIM, INC., Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–9812–TA–211.

Tax Court of Indiana.

June 30, 2004.

Francina A. Dlouhy, Baker & Daniels, Indianapolis, IN, Steven Z. Ettinger, Guardian Industries Corp., Auburn Hills, MI, for Petitioner.

Steve Carter, Attorney General of Indiana, Laureanne Nordstrom, Deputy Attorney General, Indianapolis, IN, for Respondent.

FISHER, J.

Guardian Automotive Trim, Inc. (Guardian) appeals the final determination of the Indiana Department of State Revenue (Department) denying it several exemptions from sales and use tax for mask processing equipment and supplies it acquired during the 1993, 1994, and 1995 tax years (the years at issue).

## FACTS

During the years at issue, Guardian, a Nevada corporation qualified to do business in Indiana, operated a manufacturing facility in Evansville, Indiana. Guardian manufactured grilles, headlamp bezels, and other exterior automotive components for its customers (major automotive manufacturers such as Ford, Chrysler, and General Motors).

To manufacture the automotive components, Guardian first heated plastic pellets into a liquid state. The plastic liquid was then pressure-fed into a steel mold of the appropriate design. After the plastic cooled, it was removed from the mold and trimmed, if necessary. The plastic parts were then typically loaded into boxes and stored for an average of about three days.[1]

After the storage period, the plastic parts were then sprayed with "resist," a coating that prevented the adhesion of electroplating metals and chemicals. To insure that the resist was applied to the appropriate portion of the plastic part, Guardian used a shell—i.e., a mask—that covered the areas that were to later be electroplated.[2] Guardian maintained a set

---

1. Molded parts need to "age" slightly, as plastic shrinks as it cools.

2. Depending on a particular customer's specifications, the plastic parts were only partially

of approximately four masks for each part it manufactured.[3] This enabled Guardian to use two masks at a time, while the other two were being "processed."

Guardian "processed," or cleaned, the masks after every 15 to 50 uses (i.e., after approximately one hour of use). If the masks were not cleaned periodically, the resist build-up caused the mask lines to become irregular which, in turn, caused a variety of defects on the plastic part: paint splatters, bar shadows, and poor paint application. These defects rendered Guardian's products unmarketable to its customers.

During the years at issue, Guardian used two types of mask processing systems. With the first system, the mask was suspended over a tank of acetone. The acetone was sprayed on the mask until the resist dissolved into the solution. After being blown dry, the mask was ready to use again. The second system, in contrast, was a solventless system.[4] With this system, the mask was placed on a rack in an enclosure where a heated slurry containing wax was applied. The slurry removed the resist build-up, as well as the original wax layer on the mask itself. A new wax layer was then applied to the mask, and it was ready to be used again.

To sustain continuous production of its parts, Guardian processed the masks in synchronization with the manufacturing process. More specifically, when the masks needed to be processed, the machine operator removed the masks and replaced them with two "clean" masks. This typically took less than five minutes, stopping overall production "momentarily." Essentially, during continuous twenty-four hour production periods, the two sets of masks were repeatedly swapped, hour after hour. All mask processing occurred in an area of the plant separate from where the resist painting occurred.

After the parts were resist painted, they were electroplated. The parts were then "finish painted," [5] dried, inspected for quality, cleaned, and then shipped to Guardian's customers.

## PROCEDURAL HISTORY

On September 27, 1996, after an audit revealed that Guardian had not paid sales tax on its purchases of mask processing equipment and supplies, the Department assessed Guardian use tax (including interest and penalties) in the sum of $32,824.52.[6] Guardian timely protested

---

finished with the metal; the remaining portions retained their plastic finish.

3. Guardian purchased the masks from outside sources *on behalf* of its customers. Thus, Guardian's customers owned the masks. Furthermore, Guardian testified at trial that, based on its customers' "mask budgets," it was, for the most part, limited to purchasing four masks for use in the production of each specific part. (Trial Tr. at 37.)

4. Acetone is a volatile organic compound. In recent years, Guardian has moved away from using the acetone system in order to comply with state and federal environmental regulations.

5. The finish paint operation was almost identical to the resist operation (albeit using different masks, called finish masks, with slightly different masking lines for the part than those used in the resist operation).

6. Indiana imposes sales tax "on retail transactions made in Indiana." IND.CODE ANN. § 6–2.5–2–1(a) (West 2003). Under Article 2.5 of the tax code, Indiana also imposes a use tax—which is the functional equivalent of the sales tax—on the acquisition of certain non-exempt tangible personal property that escapes sales tax, usually because the property was acquired in a transaction that occurred outside of Indiana and sales tax was not imposed. *See Rhoade v. Indiana Dep't of State Revenue,* 774 N.E.2d 1044, 1047–48 (Ind.Tax Ct.2002).

the assessment.[7] The Department subsequently denied Guardian's protest in part and sustained it in part.[8]

Guardian initiated this original tax appeal on December 31, 1998. A trial was held on December 6, 1999. The Court heard the parties' oral arguments on July 7, 2000. Additional facts will be provided as necessary.

## STANDARD OF REVIEW

■ This Court reviews final determinations of the Department *de novo*. IND. CODE ANN. § 6–8.1–5–1(h) (West 2003). Accordingly, it is bound by neither the evidence nor the issues presented at the administrative level. *Snyder v. Indiana Dep't of State Revenue*, 723 N.E.2d 487, 488 (Ind.Tax Ct.2000), *review denied.*

## DISCUSSION AND ANALYSIS

■ Guardian claims that its mask processing equipment and related supplies are exempt from sales and use tax. Accordingly, this Court notes at the outset that Guardian, as the taxpayer, bears the burden of showing that the terms of the exemptions it seeks have been met. *See Mid–America Energy Res., Inc. v. Indiana Dep't of State Revenue*, 681 N.E.2d 259, 261 (Ind.Tax Ct.1997), *review denied.* While the exemptions will be strictly construed against Guardian, the Court will not read them so narrowly as to defeat their application to the case if it is rightly within their ambit. *See Tri–States Double Cola Bottling Co. v. Indiana Dep't*

*of State Revenue*, 706 N.E.2d 282, 283–84 (Ind.Tax Ct.1999).

### 1. Indiana Code § 6–2.5–5–3

Indiana Code § 6–2.5–5–3 is often referred to as the "equipment exemption." It provides that "[t]ransactions involving manufacturing machinery, tools, and equipment are exempt from [sales and use] tax if the person acquiring that property acquires it for direct use in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property." IND.CODE ANN. § 6–2.5–5–3(b) (West 1993) (amended 2002).[9]

■ In order to qualify for this exemption, a taxpayer must first show that it is engaged in production. *See Indianapolis Fruit Co. v. Indiana Dep't of State Revenue*, 691 N.E.2d 1379, 1383 (Ind.Tax Ct.1998). "[P]roduction is 'defined broadly' and 'focuses on the creation of a marketable good.'" *Id.* (citations omitted). Thus, "any evaluation of whether production is occurring depends on the factual circumstances of the case." *Id.* at 1384. Nevertheless, the Department's rules make clear that production must entail a "substantial" change or transformation that "places tangible personal property in a form, composition, or character different from that in which it was acquired." IND. ADMIN. CODE tit. 45, r. 2.2–5–8(k) (1992 & 1996).

■ Once the taxpayer has shown that it is engaged in the production of a

---

7. In conjunction with its protest, Guardian made a payment to the Department in the amount of $3,808.40 ($3,415.24 for tax and $393.16 for interest), representing the portion of the assessment it did not contest.

8. On June 25, 1998, the Department issued a Supplemental Audit report, reducing the assessment against Guardian by $599.13.

9. This statute exempts transactions from the gross retail tax (sales tax). *See* IND.CODE ANN. § 6–2.5–5–3(b) (West 1993) (amended 2002). This sales tax exemption, however, is made applicable to the use tax by Indiana Code § 6–2.5–3–4(a)(2). *See* IND.CODE ANN. § 6–2.5–3–4(a)(2) (West 1993).

marketable good, it must then show that the equipment for which it seeks the exemption is integral and essential to that production. *Indianapolis Fruit Co.*, 691 N.E.2d at 1384. "Often, this determination is made by identifying the points where production begins and where it ends." *Id.* (citations omitted). As this Court has explained:

> A finding that production is taking place will often lead to a taxpayer receiving an exemption for activity that, standing alone, does not constitute production. [Nevertheless], the item itself does not have to have a transformational effect on the good being produced in order to be exempt from sales and use tax. It is enough that the item play[s] an integral part of the ongoing process of transformation.
>
> * * * * *
>
> This approach reflects economic reality. Modern integrated production processes require the use of a host of items that in and of themselves do not have a transformational effect on the good being produced.... *All parts of an integrated production process are closely connected with the production of goods and should therefore qualify for the exemption.*

*Id.* (internal quotation and citation omitted) (emphasis added).[10]

Guardian argues that it employs an integrated manufacturing process in order to produce its automotive trim parts. In turn, it asserts that processing its masks is integral and essential to the production of those parts. More specifically, it claims that without mask processing, it cannot sustain production of its marketable parts:

> [i]f the mask is not changed and paint builds up, the mask lines become irregular. This can cause a variety of defects on the part being produced[,] including paint splatters, bar shadows, and light paint. These defects result in both cosmetic and part durability issues.... The[se] defects ... would [not meet customer standards and thereby] cause the product to become unmarketable.

(Pet'r Post–Trial Br. at 6 (internal citations omitted).) Accordingly, Guardian argues that its mask processing equipment is entitled to the exemption under Indiana Code § 6–2.5–5–3.[11]

The Department counters, however, that mask processing is not integral and essential to Guardian's production of automotive

**10.** In *Indiana Department of State Revenue v. Cave Stone, Inc.*, 457 N.E.2d 520 (Ind.1983), the Indiana Supreme Court first applied the "essential and integral" test in determining whether the terms of the equipment exemption have been met. In that case, the taxpayer claimed the exemption for equipment and supplies associated with transporting crude stone from the blasting area to the crusher and from the crusher to separated stockpiles. *Id.* at 521–23. The Court held that the transportation equipment at issue was both essential to transforming crude stone into the marketable product of aggregate stone and integral to "the ongoing process of transformation." *Id.* at 524. The Court reasoned "[t]hat no specific transformation occurred in the period of time that it was being transported is irrelevant. It is elementary that unless the stone is transported from the quarry to the crusher and from the crusher to the stockpiles, no marketable product will result." *Id.* Thus, the Court held that the equipment exemption "provide[s] a comprehensive description of the various means of production ... [and] circumscribes *all* of the operations or processes by which the finished product is derived." *Id.* (emphasis added).

**11.** Guardian claims that its solventless mask processing equipment is also exempt under Indiana Code § 6–2.5–5–4 as well. (*See* Pet'r Post–Trial Br. at 22.) However, given this Court's decision that the equipment is exempt under Indiana Code § 6–2.5–5–3, it is unnecessary to address this claim.

trim parts for two reasons. First, it asserts that "[b]ecause 15 to 50 grilles can be painted with the same mask, a paint covered mask does not prevent continued production [ ] ... [it] merely continues the mask's useful life." (Resp't Post–Trial Br. at 8.) In other words, as the Department stated in its final determination:

> [Guardian's] cleaning of paint masks [is] a function of maintenance[.] ... While the [ ] mask washing equipment directly affect[s] the cleaning and maintenance of the protective paint masks, and may be "essential and integral" to their upkeep, such use is ultimately ancillary to [Guardian's] production of [automotive trim parts]. The cleaning activities, therefore, are not "essential and integral" to taxpayer's manufacture of [automotive trim parts].

(*See* J.Ex. 3C at p. 6.) (*See also* Resp't Post–Trial Br. at 8.) [12] Second, the Department argues that Guardian's mask processing is not essential and integral to the production of the automotive trim parts because the paint removing process halts production for a substantial period of time.[13] (*See* Resp't Post–Trial Br. at 6–7.)

In determining that Guardian's mask processing equipment did not qualify for the equipment exemption, the Department focused solely on the process of cleaning the masks. Nevertheless, Guardian's production process *as a whole* must be examined; it cannot be artificially broken down into its component parts. *See Indiana Dep't of State Revenue v. Cave Stone, Inc.,*
457 N.E.2d 520, 524 (Ind.1983). Consequently, the Department ignored the fact that the manufacture of the automotive trim parts is inextricably linked to their *proper* electroplating. Proper electroplating can only be accomplished with periodic cleaning of the masks.

Furthermore, the Department's assumption that mask processing halts production for "a substantial period of time" is contrary to the evidence presented at trial: neither party presented any evidence indicating that mask processing halts production for a "substantial amount of time." (*See, generally,* Trial Tr.) In fact, Guardian testified that while production halted for no more than five minutes at a time in order to change out the masks, the actual mask processing was performed in synchronization with the production process. (*See* Trial Tr. at 41, 52–53.) *In other words, while production halted momentarily to change the masks, production did not halt in order to process the masks.* (*See* Trial Tr. at 41, 52–53.)

The evidence in this case shows that Guardian's production process begins with the melting of the plastic pellets, and ends when the completed automotive trim parts have been packaged for shipment to Guardian's customers. *See* IND. ADMIN. CODE tit. 45, r. 2.2–5–8(d) (1992 & 1996) (stating that production "begins at the point of the first operation or activity constituting part of the integrated production process and ends at the point that the

---

12. The Department relies on the administrative regulation providing that "[m]achinery, tools, and equipment used in the normal repair and maintenance of machinery used in the production process which are predominantly used to maintain production machinery are subject to tax." IND. ADMIN. CODE tit. 45, r. 2.2–5–8(h)(1) (1992 & 1996).

13. To support this argument, the Department offers the following hypothetical: if each of
the two masks must be cleaned once each hour, "during a continuous 24 hour production period, [ ] production ceases 48 times at the resist paint and finish paint steps of the production process. Thus, if production stops for three minutes each time a mask is replaced, then for 2.4 hours of a 24 hour production period, one-tenth of a production period, production ceases[.]" (Resp't Post–Trial Br. at 7.)

production has altered the item to its *completed form*, including packaging, if required" (emphasis added)). It is indisputable that the painting of the molded plastic parts is an integral part of Guardian's manufacture of the automotive trim parts: it is part of a continuous process by which the plastic is placed in its finished form as automotive trim components, ready for delivery to Guardian's customers. Accordingly, the masks—which are used to paint the plastic parts—are exempt. (*See* Trial Tr. at 83 (where the Department concedes that the masks are exempt).) In a similar vein, the process of cleaning the masks is an integral part of Guardian's manufacture of the automotive trim parts: the cleaning of the masks is done specifically for the purpose of properly applying electroplate to the parts. If Guardian did not "clean" its masks, Guardian would only be able to produce 15 to 50 marketable automotive trim components; the rest would be rejected by Guardian's customers and therefore rendered worthless. Simply put, the masks cannot be used continuously without cleaning. Thus, the mask processing equipment, essential and integral to the overall production of Guardian's automotive trim components, is exempt under Indiana Code § 6–2.5–5–3.

2. Indiana Code § 6–2.5–5–5.1

 Guardian also claims that the "consumption exemption" of Indiana Code § 6–2.5–5–5.1 applies to the chemicals (i.e., acetone) it used during mask processing. The consumption exemption provides that

[t]ransactions involving tangible personal property are exempt from [sales and use] tax if the person acquiring the property acquires it for direct consumption as a material to be consumed in the direct production of other tangible personal property in the person's business of manufacturing, processing, refining, [or] repairing[.]

IND.CODE ANN. § 6–2.5–5–5.1(b) (West 1993) (amended 2002).[14]

This exemption is treated, in most respects, identically to the equipment exemption. *Mid–America Energy Res., Inc.*, 681 N.E.2d at 263. The parties made the same arguments with respect to both exemptions. (*See* Pet'r Post–Trial Br. at 25.) (*See also* Resp't Post–Trial Br. at 6, 9.)[15] The Court therefore finds that Guardian consumed acetone in the "direct production" of "other tangible personal property" and, therefore, is entitled to the consumption exemption.

## CONCLUSION

Guardian acquired equipment and chemicals for direct use in its manufacture of automotive trim parts. As a result, it is entitled to claim an exemption from sales and use taxes under both the equipment exemption and the consumption exemption. *See* IND.CODE ANN. §§ 6–2.5–5–3 and 6–2.5–5–5.1. The Department's final determination is, therefore, REVERSED.[16]

---

14. *See* footnote 9, *supra.*

15. While the Department makes the same argument, it relies on a different administrative regulation. More specifically, it relies on the regulation which states that purchases of materials consumed in maintenance activities are taxable, except when they are consumed in direct production and where essential and integral to the production process. IND. ADMIN. CODE tit. 45, r. 2.2–5–12(f) (1992 & 1996).

16. The Department imposed a 10% negligence penalty on Guardian's use tax deficiency assessment. *See* IND.CODE ANN. § 6–8.1–10–2.1 (West 1993). Because this Court holds

that Guardian's mask processing equipment and supplies were not subject to sales and use tax in the first place, no penalty can be due.